No. 2--06--0303                                        filed: 1/11/07

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| HELEN MARSHA PARKER HUSSUNG, | ) | Appeal from the Circuit Court |
| | ) | of Lee County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 02--L--41 |
| | ) | |
| SHASHI PATEL and NORTHERN | ) | |
| ILLINOIS PHYSICIAN GROUP, P.C., | ) | |
| d/b/a Medical Arts Center, | ) | Honorable |
| | ) | John E. Payne, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE BYRNE delivered the opinion of the court:

Plaintiff, Helen Marsha Parker Hussung, filed a medical malpractice action against defendants, Shashi Patel, M.D., and Northern Illinois Physician Group, P.C., alleging that she was injured as a result of Patel's negligent administration of an epidural steroid injection. The trial court granted defendants' motion for summary judgment, and plaintiff timely appealed. Plaintiff argues that there is a genuine issue of fact concerning whether Patel's administration of an epidural steroid injection proximately caused plaintiff's injuries and, therefore, the trial court erred in granting defendants summary judgment. For the reasons that follow, we affirm.

Plaintiff alleged the following in her amended complaint. On October 23, 2000, plaintiff saw Patel for treatment of back pain. On that same date, Patel administered an epidural steroid injection into plaintiff's back. Immediately upon the administration of the injection, plaintiff

"experienced neurologic deficits, including drop foot of the left foot, numbness, tingling, inability to speak, and inability to walk." Patel was aware during the injection that it was a "wet tap," meaning that the cerebrospinal fluid had returned into the syringe that he was using to administer the injection. Patel discharged plaintiff from his office to her home that day. Over the course of the next several days, plaintiff continued to experience symptoms of neurologic deficit, including instability when walking or standing, severe headaches, numbness, tingling, drop foot of the left foot, and confusion.

On November 3, 2000, plaintiff was admitted to CGH Medical Center in Sterling, Illinois, "in a state of confusion and with numerous symptoms of neurologic deficit." She remained there until November 8, 2000, when she was transferred to the University of Wisconsin Hospital and Clinics, in Madison, Wisconsin. While at the University of Wisconsin Hospital and Clinics, plaintiff was diagnosed with meningoencephalitis. On November 11, 2000, plaintiff was transferred back to CGH Medical Center, and she remained there until her discharge on November 15, 2000.

Plaintiff alleged that Patel committed the following negligent acts:

"A. Performed an epidural steroid injection upon Plaintiff when such an injection was contra-indicated because of Plaintiff's pre-existing persistent infection and possible epidural abscess in the area of treatment;

B. Failed to use fluoroscopy in the performance of the epidural steroid injection upon Plaintiff, in spite of fluoroscopy being indicated for a patient such as Plaintiff who has had prior back surgeries with placement of hardware in the back and, therefore, has an altered anatomy of the spine;

C. Failed to take appropriate measures to prevent neurologic damage once he became aware that the injection was a 'wet tap', that is, once cerebrospinal fluid began returning into the syringe with which he was injecting the steroid during the procedure;

D. Failed to reduce the dosage of steroid medication being injected once it became evident that the injection was a 'wet tap', in other words, once cerebrospinal fluid began returning into the syringe;

E. Failed to take the preventative measure of first administering a 'test dose' before commencing the epidural steroid injection;

F. Failed to provide any follow-up care and treatment to Plaintiff, even though complications had occurred during her epidural steroid injection;

G. Failed to provide Plaintiff with any discharge instructions should she experience problems following the epidural steroid injection; and

H. Was otherwise careless and negligent."

Plaintiff alleged that as a direct and proximate result of Patel's negligence, she "has in the past and will in the future continue to suffer permanent and severe injuries, including but not limited to damage to the spinal cord, paresthesia, disability, meningoencephalitis, foot drop of the left foot, neurologic deficits in bowel and bladder movement, neurologic deficits in sexual function and sensation, numbness, tingling, reduced power, instability in walking or standing, extreme past and future pain and suffering, and loss of a normal life, and has incurred and will continue to incur in the future bills and expenses for medical care and treatment."

On October 7, 2004, plaintiff disclosed Dr. George Mejicano and Dr. Brad Beinlich as opinion witnesses under Supreme Court Rule 213(f)(2) and Dr. Edward Brunner as an opinion

witness under Supreme Court Rule 213(f)(3).  Official Reports Advance Sheet No. 8 (April 17, 2002), Rs. 213(f)(2), (f)(3), eff. July 1, 2002.  Depositions were taken.

Mejicano, an infectious-diseases specialist at the University of Wisconsin in Madison, testified that he began treating plaintiff on November 10, 2000, after her admission to the University of Wisconsin Hospital.  When he first saw plaintiff, her diagnosis was aseptic meningitis with an etiology undetermined.  Mejicano made the following notation after his initial visit with plaintiff:

"Aseptic meningitis following paraspinal injection on October 26th, 2000, I think that the clinical picture is most consistent with an adverse drug reaction from the injection.

The reaction that occurred immediately is very suggestive of lidocaine toxicity. Moreover, lidocaine and bupivacaine *** have both been implicated in cases of aseptic meningitis.

I doubt the steroid had much to do with it, but steroids are often mixed with lidocaine for these kinds of injections.

It's also possible that this is partially treated meningitis due to her chronic Cipro, a parameningo focus due to klebsiella infection or an enteral virus infection.

The temporal association with the injection, however, is highly suggestive of a drug-induced process.

I doubt this is HSV [herpes simplex virus], but it is prudent to continue until HSV PCR [polymerase chain reaction] is back.  I also doubt this is chronic meningitis due to TB or fungi.  I expect a fairly quick recovery."

He summed up the above note as follows:

"Briefly, what I think happened was that she received a steroid injection. The steroid was mixed with some sort of painkiller, either lidocaine or bupivacaine.

She had some sort of reaction almost immediately following that injection. I remember something about low blood pressure, unresponsiveness, et cetera.

Following that, not immediately but several days afterwards, that's when her mental status started to decrease.

So when I'm talking about the time frame piece, it seems that something had happened at the time of the injection or thereafter, although I can't prove that."

Later, after reviewing plaintiff's MRI report and the results of her spinal fluid test, Mejicano changed plaintiff's diagnosis from aseptic meningitis to herpes simplex virus type 2 (HSV-2) encephalitis or meningoencephalitis. He put plaintiff on a three-week course of acyclovir to treat the HSV-2 and saw her for a follow-up appointment on January 3, 2001.

After his follow-up appointment with plaintiff, Mejicano made the following note:

"HSV encephalitis, resolved. No further therapy. Patient and I discussed the epidemiology and risk of recurrence (the latter is minimal).

It's possible a steroid injection triggered a reactivation, but this is strictly speculation on my part."

When asked what he meant by the latter comment, he stated:

"Well, herpes viruses can be reactivated by a number of things, for example, uvulites, stress, different foods, et cetera.

It's possible that there was a mechanical trauma to the back that then triggered the genome of the virus to start producing a--to cause a re-activation."

Mejicano was asked whether the steroid itself could have caused a reactivation. He responded: "If you're talking about a steroid injection of a lumbar spine, the answer is no to your question."

Mejicano was asked whether he had any criticism of Patel's performance of the epidural steroid injection. He responded:

"A. ***

Following a steroid injection something occurred that caused what I would call fairly significant symptoms. Something happened.

Whether that was due to a physician's actions or inactions is really difficult for me to know.

The timing suggests that something happened, but it could have been a perfectly placed needle injection with a chemical reaction that triggered the symptoms. Who knows.

Q. So that would be purely speculation on your part?

A. Yes."

Beinlich, a neurologist at the University of Wisconsin in Madison, testified that plaintiff became his patient on March 15, 2001. She was suffering from "mental status changes and leg weakness, confusion and leg weakness." She had meningoencephalitis and HSV-2. When asked whether he had any idea what had caused plaintiff's meningoencephalitis, Beinlich responded: "No, I don't think you can tell. I think there were theories rendered at the time. I think they're still legitimate, and I think it's speculation as to what happened." When he began treating plaintiff, he wrote the following in her chart: "Hospitalized here at UW in November 2000. Complication

of an epidural steroid injection."  When asked his basis for making that notation, he responded: "Well, I think in reviewing the chart, that seemed like the most likely cause of her problems given the temporal relationship to what had happened to her and her history that she provided that day." He also wrote: "In summary, [plaintiff] developed a polyradiculopathy following an epidural steroid injection of October of 2000 resulting in severe axonal[1] injury."

Beinlich testified that there are three possibilities that could account for plaintiff's condition following the injection.  The first is that the injection caused a reaction that triggered a chemical meningitis that resulted in an encephalitis and polyradiculitis.  The second possibility is that plaintiff had a partially treated bacterial infection and that she suffered complications of partially treated meningitis.  The third possibility is that the complications were related to HSV-2, which had been cultured from plaintiff's cerebrospinal fluid.  After listing the possibilities, Beinlich stated:  "And, frankly, I can't tell you which of those is true, and I don't think anybody else can."

Beinlich was asked whether he had an opinion to a reasonable degree of medical certainty that there is a causal connection between the steroid injection and plaintiff's axonal injury.  He responded:

> "As I previously stated, I think it would be speculation.  I think that it's impossible to be certain.
>
> I think that the temporal relationship certainly suggests that it was a complication. I understand that herpes simplex is there.

---

[1]An axon is a usually long and single nerve-cell process that usually conducts impulses away from the cell body.  Merriam-Webster's Collegiate Dictionary 81 (10th ed. 2001).

I don't know what the cause and effect of the herpes simplex or if it's simply reactivation of herpes simplex related to having this other process going on, and I don't know that."

Beinlich also testified about an EMG test that he performed on plaintiff, which disclosed multiple nerve root injuries. He was asked whether the injuries could have resulted from plaintiff's previous back surgeries. The following colloquy occurred:

"Q. *** [I]f there was some sort of process that had a surgery, and then I believe you said that the surgery itself could cause some problems to the nerve root?

A. Well, surgery usually doesn't. The results of having, you know, chronic back problems, having had multiple surgeries, you know, there can be complications from those things.

And is the question if she--if we were to study her before [the injection], would it look like this?

Q. Yes.

A. Very unlikely. I mean, she could have, you know, maybe one nerve root involved or something like that, but it's not impossible that she could have some spontaneous activity.

But in a situation like this where she subacutely got severe leg weakness and then you see this at multiple nerve root levels, I think you'd be hard-pressed to attribute it to anything else but [the injection].

Q. But you really don't know what caused her problem in November of 2000, correct?

[Plaintiff's counsel]: Objection.

A. We know she became very weak and she had multiple nerve root injuries, and that's all this is a reflection of. Doesn't tell you how or why. It just shows you what happened."

Brunner, a retired anesthesiologist, testified that in his opinion, Patel violated the standard of care when he performed the epidural steroid injection on plaintiff. As a result, "plaintiff was left with serious neurologic deficits, including damage to the spinal cord, paresthesia, neurologic deficits in bowel and bladder movement and in sexual function and sensation, instability when walking or standing, severe headaches and drop foot of the left foot." When asked the basis of his opinion, he stated: "The epidural steroid injection was followed by the development of left leg and foot weakness and a progressive syndrome which led to hospitalization. The diagnosis was meningoencephalitis that was caused by a herpes simplex virus that was activated as a result of this epidural steroid treatment." When asked what Patel did to activate the HSV-2, Brunner responded: "I don't know the answer to that question. The syndrome began subsequent to his treatment. His treatment had violated the standard of care and, therefore, I feel that there's a direct cause and effect." With regard to the HSV-2, he stated:

"[It] might have been dormant in the wound area and spread into the cerebrospinal fluid when [Patel] injected. It might have been dormant in the central nervous system and the stress of the situation could have activated it.

I'm not--as you indicated, I'm not a bacteriologist or a microbiologist or a specialist in infectious disease. And I would defer to one of them to answer the question that you've posed to me."

In addition, the following colloquy occurred:

"Q. I mean, your opinions with respect to the causative effect between Dr. Patel's 10/23/00 injection and [plaintiff's] problems are basically based on the timing of the problems as they appeared after the last injection of 10/23; agreed?

A. They're based on the timing of the problems and the fact that [Patel] violated standard of care by doing the epidural block."

On October 3, 2005, defendants moved for summary judgment, arguing that plaintiff failed to produce expert testimony causally linking Patel's alleged negligent acts or omissions to plaintiff's claimed injuries. Defendants argued that Brunner's opinion that Patel's negligence caused plaintiff's injuries was based only on the fact that the injury occurred subsequent to the injection. Defendants argued that post hoc ergo propter hoc (after the fact, therefore because of the fact) is a logical fallacy and that summary judgment is appropriate where it is the only basis for causation.

In response, plaintiff argued that Brunner never wavers in his testimony that Patel's negligence caused plaintiff's injuries; rather, he "merely clarifies that he cannot pinpoint the precise moment at which Dr. Patel's conduct caused Plaintiff's injury to occur." In addition, plaintiff argued that the testimony of Beinlich and Mejicano raises a genuine issue of material fact as to the causal relationship between Patel's conduct and plaintiff's injuries.

On February 14, 2006, the trial court granted defendants' motion for summary judgment. The trial court held that "no testimony provides any foundational support to establish that any act or omission of Dr. Patel was the proximate cause of the Plaintiff's injuries." Plaintiff timely appealed.

Summary judgment should be granted only when the pleadings, depositions, admissions on file, and affidavits, if any, show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. 735 ILCS 5/2--1005(c) (West 2004); Gyllin v. College Craft Enterprises, Ltd., 260 Ill. App. 3d 707, 711 (1994). The movant's right to summary judgment must be clear and free from doubt. Sunderman v. Agarwal, 322 Ill. App. 3d 900, 902 (2001). When deciding a motion for summary judgment, the court should construe the pleadings, depositions, admissions on file, and affidavits strictly against the movant and liberally in favor of the nonmoving party. Sunderman, 322 Ill. App. 3d at 902. To survive a motion for summary judgment, the nonmoving party must present a factual basis that would arguably entitle her to a judgment in her favor. Sunderman, 322 Ill. App. 3d at 902. If a plaintiff cannot establish an element of her cause of action, summary judgment is proper. Gyllin, 260 Ill. App. 3d at 711. While a plaintiff need not prove her case at the summary judgment stage, she must present enough evidence to create a genuine issue of fact. Gyllin, 260 Ill. App. 3d at 710. Our review of an order granting summary judgment is de novo. Gyllin, 260 Ill. App. 3d at 711.

"A plaintiff in a medical negligence case must prove the following elements: (1) the standard of care against which the medical professional's conduct must be measured; (2) the defendant's negligent failure to comply with that standard; and (3) that the defendant's negligence proximately caused the injuries for which the plaintiff seeks redress." Sunderman, 322 Ill. App. 3d at 903. Defendants argue that there is no genuine issue of fact as to whether Patel proximately caused plaintiff's injuries. While the issue of the existence of proximate cause is generally a question of fact, at the summary judgment stage the plaintiff must present affirmative evidence that the defendant's negligence was arguably a proximate cause of the plaintiff's injuries. Gyllin,

-11-

260 Ill. App. 3d at 710-11. The existence of proximate cause cannot be based on "mere speculation, guess, or conjecture." Gyllin, 260 Ill. App. 3d at 714. "When the material facts are undisputed and there can be no reasonable difference in judgment as to the inferences drawn from the facts, and there has been no affirmative showing of proximate cause, a plaintiff has failed to establish a genuine issue of material fact. At this point, proximate cause is a question of law and summary judgment is proper as a matter of law." Gyllin, 260 Ill. App. 3d at 711.

Plaintiff argues that the trial court erred in holding that there was no genuine issue of fact as to the existence of proximate cause. Plaintiff contends that the timing between the administration of the injection and plaintiff's injury "is so remarkable, so contemporaneous, that its causal relationship is evident and cannot be doubted." According to plaintiff, the circumstances justify an inference of proximate cause. Defendants respond that the temporal relationship between the alleged negligence and plaintiff's injury is insufficient to raise a genuine issue of fact as to the existence of proximate cause. We agree with defendants.

From a review of plaintiff's experts' deposition testimony, it is evident that none of plaintiff's experts can point to any affirmative evidence linking the steroid injection to plaintiff's injuries. The evidence established that plaintiff suffered from meningoencephalitis. According to Brunner, the meningoencephalitis resulted from the activation of a dormant herpes simplex virus in plaintiff. Although Brunner opined that Patel's negligent administration of the epidural steroid injection caused the activation of the HSV-2, he conceded that his conclusion was based solely on the temporal proximity between Patel's treatment of plaintiff and the activation of the HSV-2. When asked what conduct of Patel triggered the dormant HSV-2, Brunner deferred to a bacteriologist or a microbiologist or a specialist in infectious disease.

Similarly, neither Mejicano nor Beinlich could pinpoint the precise cause of plaintiff's injuries. Like Brunner, both doctors attributed any causal connection to the temporal relationship between the injection and the injury. Mejicano made the following note after treating plaintiff: "It's possible a steroid injection triggered a reactivation [of the HSV-2], but this is strictly speculation on my part." He testified: "The timing suggests that something happened." When Beinlich was asked whether he had an opinion to a reasonable degree of medical certainty that there is a causal connection between the steroid injection and plaintiff's axonal injury, he stated:

"I think it would be speculation. I think that it's impossible to be certain.

I think that the temporal relationship certainly suggests that it was a complication. I understand that herpes simplex is there.

I don't know what the cause and effect of the herpes simplex or if it's simply reactivation of herpes simplex related to having this other process going on, and I don't know that."

In sum, absent the temporal relationship, none of the doctors provided a factual basis for a conclusion that the injuries resulted from the steroid injection. "An expert's opinion is only as valid as the bases and reasons for the opinion. When there is no factual support for an expert's conclusions, his conclusions alone do not create a question of fact." Gyllin, 260 Ill. App. 3d at 715. Because plaintiff failed to present any testimony establishing that Patel's administration of the epidural steroid injection proximately caused plaintiff's injuries, summary judgment was properly granted.

We reject plaintiff's argument that the "remarkable" temporal relationship between the injection and plaintiff's injuries is sufficient to support an inference of causation and thus to raise a

genuine issue of fact as to proximate cause. Although she argues to the contrary, plaintiff is essentially asserting a post hoc ergo propter hoc argument, which our court has rejected as "one of the classic logical fallacies." Manias v. Peoria County Sheriff's Department Merit Comm'n, 109 Ill. App. 3d 700, 703 (1982). And while it appears that no Illinois case has said so explicitly, other jurisdictions have held that a " 'temporal association alone does not suffice to show a causal link' because a mere temporal coincidence between two events does not necessarily entail a substantial causal relation between them." Lasley v. Georgetown University, 688 A.2d 1381, 1387 (D.C. App. 1997), quoting Hodges v. Secretary of the Department of Health & Human Services, 9 F.3d 958, 960 (Fed. Cir. 1993), quoting Grant v. Secretary of the Department of Health & Human Services, 956 F.2d 1144, 1148 (Fed. Cir. 1992); see also Derzavis v. Bepko, 766 A.2d 514, 521-22 (D.C. App. 2000) (rejecting the plaintiff's argument that the jury could infer causation where the plaintiff's injury occurred contemporaneously with the defendant doctor's performance of a Pap smear); Hasler v. United States, 718 F.2d 202, 206 (6th Cir. 1983) (rejecting as "merely conjectural" the plaintiff's argument that causation could be inferred between a swine flu vaccination received by the plaintiff and the sudden onset of her rheumatoid arthritis).

In Lasley, the plaintiff brought a malpractice action against his doctor for damages sustained as a result of blood vessels that ruptured during an embolization procedure. Lasley, 688 A.2d at 1382-83. After the plaintiff failed to present any expert testimony establishing how the embolization procedure caused his injuries, the trial court granted the defendant's motion for judgment as a matter of law. Lasley, 688 A.2d at 1383. The issue on appeal was whether the plaintiff was required to present expert testimony to prove causation. The plaintiff argued that expert testimony was unnecessary because "causation is obvious." Lasley, 688 A.2d at 1383.

Like plaintiff in the present case, the Lasley plaintiff argued that "the temporal coincidence of the procedure and the rupture reveals the causal link between them." Lasley, 688 A.2d at 1383. The plaintiff additionally argued that expert testimony would "provide nothing more than supposition" because the doctors were "puzzled by the precise causes of the vessel rupture." Lasley, 688 A.2d at 1384.

The Lasley court rejected the plaintiff's arguments. The court stated: "In a medically complicated case such as this, contemporaneity between a medical procedure and an injury is too weak a foundation upon which to infer causation. Correlation and causation are hardly synonymous." Lasley, 688 A.2d at 1387. As in our case, in Lasley, no expert ever detailed exactly how and why the plaintiff's injuries occurred. Lasley, 688 A.2d at 1387. "Informed only of the conjunction of a condition, a procedure, and an injury, a lay jury could not have pinpointed the cause of Lasley's vessel rupture without blindly guessing." Lasley, 688 A.2d at 1387. So too here. Although plaintiff in our case did present expert testimony, the testimony failed to establish how and why plaintiff's injuries occurred. When questioned about causation, each expert relied on the timing of the events. As noted by the Lasley court, if we were to conclude that contemporaneity could prove causation, we would inappropriately shift the burden of proof from the plaintiff to the defendant. Lasley, 688 A.2d at 1387; see also Derzavis, 766 A.2d at 522. Instead of requiring plaintiff to establish how and why the epidural steroid injection resulted in the claimed injuries, we would effectively force defendant to disprove the same.

Accordingly, we hold that plaintiff failed to raise a genuine issue of fact as to proximate cause and, therefore, the trial court properly granted defendants summary judgment. We affirm the order of the circuit court of Lee County.

Affirmed.

McLAREN and BOWMAN, JJ., concur.