FOURTH DIVISION
JULY 10, 2008

Nos. 1-07-0954 and 1-07-0955 (Consolidated)

| | | |
|---|---|---|
| STEPHEN WARTALSKI, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| JSB CONSTRUCTION AND CONSULTING | ) | |
| COMPANY, and JMS ELECTRIC, INC. | ) | Honorable |
| | ) | James M. Varga, |
| Defendants-Appellants. | ) | Judge Presiding. |

JUSTICE CAMPBELL delivered the opinion of the court:

This appeal arises out of a jury verdict entered in favor of a pipefitter who was injured while working on a retail restaurant building construction site. Construction contractors JSB Facilities Consultants, Inc., d/b/a JSB Construction and Consulting Co. (collectively, JSB), and JMS Electric (JMS), appeal from a judgment entered in favor of plaintiff, Stephen Wartalski, in his negligence claim. On appeal, JSB and JMS (JSB/JMS) contend that the trial court improperly permitted two medical experts to testify that Wartalski sustained ultraviolet (UV) radiation injuries contrary to the "general acceptance test" espoused in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). For the following reasons, we affirm the judgment of the trial court.

BACKGROUND

In September 2001, Wartalski, a journeyman pipefitter, worked for Climate Service, Inc., (Climate Service), a subcontractor of JSB, on an expansion of a Panera Bread (Panera) restaurant in

Evanston, Illinois.  JMS subcontracted with JSB to provide electrical work and temporary lighting for the construction site.  While working under a construction light, the glass shield surround broke and Wartalski was exposed to the ultraviolet (UV) radiation contained within the light bulb fixture.  Wartalski suffered first degree burns and sued JSB, JMS and Panera[1] for negligence, alleging that exposure to UV radiation caused him to develop facial contractions and traumatic dystonia.

## Pretrial

JSB and JMS filed cross-claims against each other for contribution as well as a third-party complaint for contribution against Wartalski's employer, Climate Service.

JSB/JMS then filed a joint pretrial motion pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), to bar the opinion testimony of Wartalski's experts, Drs. Michael Rezak and Jerrold Leikin.  JSB/JMS argued that the doctors' opinions that the UV radiation from the light bulb caused injury to Wartalski's seventh cranial nerve were based on methodologies and scientific principles that were not generally accepted in the medical and scientific fields.

The trial court scheduled a *Frye* hearing, but, after considering the combined motion, concluded the principles of *Frye* did not apply to this case.  The trial court therefore denied JSB/JMS's  motion to bar the expert opinions without conducting a formal *Frye* hearing.

## Trial

At trial, Wartalski testified that on September 21, 2001, he was working at Panera, standing on a ladder, working a control box 14 feet in the air, 9 feet from the floor.  A construction light was located "a little bit" behind Wartalski, within two feet of his head.  At about 11 a.m., Wartalski took

---

[1]The trial court granted judgment in favor of defendant Panera LLC d/b/a Panera Bread Co., (Panera) dismissing it from the case.  Panera is not a party on appeal.

a piece of cardboard and swatted away a swarm of bees that were bothering him. The cardboard made contact with the bulb and the glass around the light shattered, causing the light to burn out. Wartalski climbed down the ladder to clean the broken glass off his clothes. Upon returning, Wartalski discovered that the light had been restored; an electrician told Wartalski not to touch the fixture contained within the cage.

The shattered light was a metal halide that uses 300 volts to produce an electric arc that emits ultraviolet light. Unlike a household light, the lamp will operate even if the bulb surround is missing. Halide lights contain warnings that they can cause serious skin burns produced by short wave UV radiation. A glass envelope surrounds the light shielding users from radiation exposure.

Wartalski continued to work on the same control box for 2 ½ hours after his lunch break, with the light about an arm's length away from him on his left side. Wartalski did not notice anything unusual.

On his way home, however, Wartalski felt his left eye becoming "very scratchy." The next morning, Wartalski discovered a bright red burn down the left side of his face and neck and his left eye was swollen shut. Wartalski went to a clinic for treatment. Within a week, his eye improved and the swelling subsided. In the third week of October, however, Wartalski noticed that the left side of his face began to droop, his forehead was stiff and he was unable to close his left eye. Wartalski went to an emergency room and was diagnosed as having Bell's Palsy, a condition resulting from injury to the seventh cranial nerve, usually caused by a virus.

Although his seventh cranial nerve recovered over the following weeks, Wartalski's face eventually became paralyzed and he started to have pain in his cheek. Later, Wartalski began to experience contractions on the left side of his face and in his left arm.

Wartalski called the Poison Control Center and received a referral to Dr. Leikin. Dr. Leikin examined Wartalski twice and then referred him to Dr. Rezak, a neurologist. Dr. Rezak tested Wartalski by touching him with a tuning fork and Wartalski experienced contractions. Dr. Rezak prescribed Klonopin and Botox shots to reduce the contractions.

Dr. Rezak, a board-certified neurologist, testified as an expert on Wartalski's behalf. Dr. Rezak holds positions on several national boards, including the American Parkinson's Disease Association, and is an instructor at the American Academy of Neurology in the use of Botox (botulinum toxin) for the treatment of dystonia.

In April 2002, Dr. Rezak diagnosed Wartalski as suffering from post-traumatic segmental dystonia, resulting from a seventh nerve injury, caused by exposure to UV light. Dr. Rezak stated that Wartalski's contractions were "synkinetic movements," and explained that when an injured seventh nerve grows back, it sometimes connects to two muscles in such a way so that a facial expression using one muscle may trigger a movement of another muscle. Dr. Rezak explained that Wartalski's separate facial, neck and shoulder contractions were dystonic in nature in that they were triggered by sudden noise. Dr. Rezak described the dystonic contractions as "quite dramatic and disabling." All of Dr. Rezak's findings were related to the seventh nerve injury. Dr. Rezak never before heard of a patient with a first degree burn injury developing this condition.

Dr. Rezak distinguished Wartalski's injury from Bell's Palsy, which "implies a viral etiology," *i.e.*, Bell's Palsy is caused by a virus, and is not related to the development of dystonia, whereas a seventh nerve palsy is left open to other etiologies. Dr. Rezak opined that, to a reasonable degree of medical certainty, the UV burn caused the seventh cranial nerve damage which led to the development of post-traumatic dystonia.

Dr. Jerrold Leikin testified that he treated Wartalski for his first degree burn and other symptoms and, after considering and rejecting a diagnosis of Bell's Palsy, he diagnosed Wartalski's condition as seventh nerve neuritis. Bell's Palsy resolves in a few months whereas neuritis, an inflammatory condition, lasts for years and causes contractions.

Dr. Leikin noted that UV is used in germicidal lights and tanning salons. UVA and UVB, two types of UV radiations, are mostly associated with sunburn; UVA penetrates deeper.

Drs. Leikin and Rezak authored an article together on Wartalski's condition entitled, "Facial Nerve Neuritis Secondary to Ultraviolet Radiation" that appeared in the Veterinary and Human Toxicology Journal. The article concluded that there existed a relationship between the concentrated exposure of UV and neuritis.

Dr. Leikin opined, based on a reasonable degree of medical certainty, that the exposure to the uncovered light at the Panera worksite caused Wartalski's injury.

Dr. Morris Soriano testified as an expert witness on behalf defendants, opining that Drs. Leikin and Rezak both used an improper and unacceptable methodology to derive their opinions. Dr. Soriano stated that the temporal relationship between the onset of Bell's Palsy symptoms in October 2001 and Wartalski's exposure to the UV light in September 2001 was unscientific and not a proper means or determining causation; the seventh cranial nerve is shielded by skin, muscle and the skull, and no medical or scientific literature suggests that UV radiation can penetrate the skin, much less muscle or skull. Dr. Soriano stated that UV radiation can only penetrate the skin through a tear, cut or open wound with excoriation (erosion) of the skin. Dr. Soriano opined that Wartalski sustained nothing beyond a first-degree "sunburn" from exposure to UV radiation contained in the light.

Dr. Soriano concluded that, using generally accepted scientific principles, theories or methodologies, Wartalski suffered from a coincidental onset of Bell's Palsy, most likely caused by a virus, and that his condition was unrelated to UV radiation exposure.

Following trial, the jury found in favor of Wartalski and awarded $925,700 in damages. JSB and JMS now appeal from the trial court's order allowing Wartalski's experts to testify at trial, contending that the testimony should have been barred under the *Frye* "general acceptance test."

OPINION

Jurisdiction on Appeal

Wartalski initially raises the jurisdiction of this court to decide this appeal, arguing that JSB/JMS failed to preserve this issue for review for failure to raise it in a posttrial motion. This court has an independent duty to review questions of jurisdiction and can do so at any time. See, *In re Marriage of Waddick*, 373 Ill. App. 3d 703, 705, 869 N.E.2d 1089 (2007).

Wartalski observes that an appeal from a jury verdict is governed by section 2-1202(b) of the Code of Civil Procedure which provides that relief following a jury verdict must be sought in a single posttrial motion. 735 ILCS 5/2-1202(b) (West 2006). Because JMS/JSB failed to filed a section 2-1202 posttrial motion, Wartalski argues that JSB/JMS waived their right of review and this court has no jurisdiction. *Blue v. Environmental Engineering, Inc.*, 215 Ill. 2d 78, 828 N.E.2d 1128 (2005); *Raabe v. Maushak,* 55 Ill. App. 3d 169, 371 N.E.2d 96 (1977).

JSB/JMS respond that they were required only to file a timely notice of appeal from the final judgment; no post-trial motion was necessary.

JSB/JMS is correct: jurisdiction of the appellate court is prescribed by the Constitution as well as Supreme Court Rule 301, which provides in pertinent part that an "appeal is initiated by

filing a notice of appeal. No other step is jurisdictional." 155 Ill. 2d R. 301; see also *Echols v. Olsen*, 63 Ill. 2d 270, 347 N.E.2d 720 (1976). Wartalski's reliance on section 2-1202 is in error; section 2-1202 does not apply to nonjury matters such as *Frye* rulings, nor does section 2-1202 establish or limit the appellate court's jurisdiction. No postjudgment motion is required to preserve matters determined without a jury for review on appeal. *Mohn v. Posegate*, 184 Ill. 2d 540, 705 N.E.2d 78 (1998); *City of Evanston v. Piotrowicz*, 20 Ill. 2d 512, 516, 170 N.E.2d 569 (1960) ("No jury having intervened, *** no post-trial motion was necessary").

JSB/JMS did not waive for review the issues now raised on appeal.

Expert Testimony

On appeal, JMS/ JSB contend that the trial court erred in permitting the expert testimony of Wartalski's two physicians that exposure to the uncovered light and UV radiation caused Wartalski's seventh cranial nerve damage. JSB/JMS argue that the doctors' opinions that the exposed light caused injury to Wartalski's seventh cranial nerve failed to meet the *Frye* "general acceptance" test and should have been barred. JSB/JMS contend that Drs. Rezak and Leikin based their causation opinions on methodologies and principles that have never been generally accepted by the courts or the medical or scientific communities. Our review of a trial court's disposition of a *Frye* issue is *de novo*. *In re Commitment of Simons,* 213 Ill. 2d 523, 821 N.E.2d 1184 (2004).

Under the general acceptance test espoused in *Frye*, "scientific evidence" is only admissible at trial if the methodology or scientific principle upon which the evidence is based is "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye,* 293 F. at 1014. Illinois adopted the *Frye* general acceptance test in *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 767 N.E.2d 314 (2002).

Courts apply the *Frye* test only where the scientific principles, technique or test in support of the expert's conclusion is "new" or "novel." *In re Marriage of Bates*, 212 Ill. 2d 489, 819 N.E.2d 714 (2004). Under *Frye* and its progeny, scientific evidence is considered new or novel if it is " 'original or striking' " or does not resemble anything formerly known or used. *Donaldson*, 199 Ill. 2d at 78-79, quoting Webster's Third New International Dictionary 1546 (1993).

JSB/JMS argue that Drs. Rezak and Leikin relied merely on a "temporal relationship" methodology in concluding that Wartalski's exposure to UV radiation in September 2001 caused his neuritis/dystonia in October 2001 and that the temporal relationship methodology is not generally accepted. In support, JSB/JMS rely primarily on *Kane v. Motorola, Inc.,* 335 Ill. App. 3d 214, 779 N.E.2d 302 (2002), and *Hussung v. Patel*, 369 Ill. App. 3d 924, 861 N.E.2d 678 (2007). In both cases this court concluded that the temporal relationship between two events did not necessarily mean that they were causally related. In *Kane*, the plaintiff wore a cellular telephone antenna close to his right ear while conducting field tests for Motorola. Several days later, the plaintiff developed an excess amount of wax in his right ear and later developed a brain tumor in the same area. This court barred the opinions of experts who concluded that the plaintiff's exposure to radio frequency radiation caused a tissue burn that, in turn, caused his brain tumor. This court concluded that the experts' opinions "were based on speculation rather than sound science." *Kane*, 335 Ill. App. 3d at 222.

In *Hussung*, the defendant physician gave the plaintiff an epidural steroid injection. Immediately afterwards, the plaintiff began to notice neurological deficits, numbness and tingling. The plaintiff's treating physicians concluded that the injection caused the onset of neurological symptoms. This court, however, similarly rejected the temporal relationship between the injections

8

and the injuries, holding that the experts' opinions were based on the " 'classic logical fallacy' " of *post hoc ergo propter hoc* (after this; therefore because of this) and failed to show a causal link between the two events. *Hussung*, 369 Ill. App. 3d at 933, quoting *Manias v. Peoria County Sheriff's Department Merit Comm'n,* 109 Ill. App. 3d 700, 703 (1982).

This case is distinguishable from both *Kane* and *Hussung.* In *Kane,* a case decided on summary judgment, the plaintiff relied not on the opinions of his treating physicians but on two other expert witness physicians, neither of whom could conclude to a reasonable degree of medical certainty that the plaintiff's exposure to radio frequency caused his brain tumor. *Kane*, 335 Ill. App. 3d at 217.

*Hussung* was also decided on the defendants' motion for summary judgment. The plaintiff there disclosed three physicians as opinion witnesses; one was the plaintiff's treating physician. The treating physician testified in a depositions that " 'I think the clinical picture is most consistent with an adverse drug reaction from the injection,' " but also that " 'I doubt the steroid had much to do with it.' " *Hussung*, 369 Ill App. 3d at 926. He concluded that "something had happened at the time of the injection or thereafter, although I can't prove that." *Hussung*, 369 Ill. App. 3d at 927. The two other experts testified in depositions that the relationship between the injection and the plaintiff's injury was either speculative, unknown or required further consultation with a specialist. *Hussung*, 369 Ill. App. 3d at 929-30. In light of these facts, this court held that there was no factual basis for the physician's conclusions. *Hussung*, 369 Ill. App. 3d at 932.

We find that the trial court correctly determined that this case did not present a *Frye* question. As stated above, *Frye* applies in the case of admission of novel or new scientific evidence. In rejecting JSB/JMS's request for a *Frye* hearing, the trial court relied on *Noakes v.*

*National R.R. Passenger Corp.*, 363 Ill. App. 3d 851, 845 N.E.2d 14 (2006). There, this court considered the propriety of the admission of a treating physician's testimony that the plaintiff's carpel tunnel syndrome was aggravated by his job. This court rejected a *Frye* hearing, holding that medical testimony is not novel: "This case involves a treating physician giving an opinion as to the cause of his patient's condition." *Noakes*, 363 Ill. App. 3d at 856.

As this case similarly involves the expert testimony of two treating physicians, the trial court correctly relied on *Noakes*. JSB/JMS's citations to authority regarding the general acceptance test are therefore inapplicable.

Contrary to JSB/JMS's assertions, moreover, a temporal relationship is, in fact, an acceptable basis for an expert's opinion. *Valiulis v. Scheffels*, 191 Ill. App. 3d 775, 547 N.E.2d 1289 (1989) (evidence sufficient for jury to conclude that trauma of accident caused onset of symptoms of MS).

We conclude that the trial court correctly declined to hold a *Frye* hearing. *Frye* does not apply because Wartalski presented the testimony of his own treating physicians. We therefore affirm the judgment of the trial court.

Affirmed.

O'BRIEN and MURPHY, JJ., concur.