2016 IL App (1st) 150118

No. 1-15-0118

Opinion filed May 11, 2016

THIRD DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| LEAH LIBOLT, | ) | Appeal from the |
| | ) | Circuit Court |
| Plaintiff-Appellant, | ) | of Cook County, |
| | ) | Illinois. |
| v. | ) | |
| | ) | No. 13L11649 |
| WIENER CIRCLE, INC., | ) | |
| | ) | The Honorable |
| Defendant-Appellee. | ) | Kathy Flanagan, |
| | ) | Judge Presiding. |

JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Lavin and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff Leah Libolt sued defendant restaurant Wiener Circle, Inc., for injuries allegedly sustained in a fall at the restaurant. Wiener Circle filed a motion for summary judgment under section 2-1005 of the Code of Civil Procedure (735 ILCS 5/2-1005 (West 2012)). After a full briefing, the trial court granted summary judgment in favor of Wiener Circle. Plaintiff appeals, contending summary judgment was improper because: (1) Wiener Circle owed her a duty of care as its invitee to protect her from or warn her of the dangers associated with the late night nature of its business; and (2) the issue of proximate cause

should be presented to the jury. For the following reasons, we reverse and remand for further proceedings.

¶ 2                                    BACKGROUND

¶ 3          The following facts are taken from depositions and pleadings below. Plaintiff testified in her deposition that she was visiting Chicago with friends on October 22, 2011. They went to dinner and then had a few drinks at various bars. Around 2 in the morning, plaintiff and five or six friends went to Wiener Circle. Plaintiff testified she was "tipsy" from the drinks. Plaintiff did not know what to expect other than that Wiener Circle was a hot dog restaurant, and noted on arrival that it was "very rowdy and lively." Her friends explained to her that "this is [Wiener Circle's] shtick, they yell at people."

¶ 4          The restaurant was "fairly crowded" upon arrival. Plaintiff waited in line to order food with Andrew and Robert Lady. There were "a bunch" of people in line and, by the time plaintiff's group was nearly at the front of the line, plaintiff had noticed an unidentified man going "in and out" of the restaurant. She does not know the man's name, but described him as loud and obnoxious. She thinks he was intoxicated, although she did not smell alcohol on him nor see him have trouble with his equilibrium. Although there was good-natured verbal sparring between staff and customers, plaintiff thought the interaction between staff and the man was aggressive and not good-natured. She saw restaurant employees tell the man to leave the restaurant. At one point, the woman behind the counter waved a large spoon at him in a manner that was "fairly aggressive" and threatening. When the man returned, plaintiff was standing in line talking to her friend Abigail D'Autremont. She could see the interaction between the employees and the man was escalating, and "a bunch" of people told the man to leave. As she stood talking with Abigail, she heard somebody say, "Leah, watch out." She

said, "I don't see what happens and, like, I catch myself with my left arm falling over." The unidentified man had run into her, knocking her to the ground. Plaintiff does not know why the unidentified man ran into her, *i.e.*, whether or not he was pushed, or who may have pushed him. Nor does she know if the woman behind the counter with the spoon made a "specific threat of violence" to the man.

¶ 5        Plaintiff testified she fell toward the ground, catching herself with her left arm. She "didn't even fall all the way down," but pushed herself right back up. She knew immediately that her left arm was injured. She told her friends her arm was broken, but they did not believe her because the fall was so quick. They left the restaurant and sat outside on a bench. Abigail went back inside and got ice from a Wiener Circle employee, which plaintiff applied to her left elbow. Plaintiff then went by taxi to the hospital.

¶ 6        When asked if she knew if it was the unidentified man who bumped into her, she said she did not. She also testified she did not talk to any of the employees at Wiener Circle after she fell. From the time she entered the restaurant to the time she fell, all employees were behind the counter. They never emerged from behind the counter. She does not know if anyone called the police and, if they did, she left for the hospital before any police arrived. Other than telling the man to leave, plaintiff did not see the counter staff make any further effort to remove the man from the premises. She did not hear any employee threaten to call the police.

¶ 7        At the hospital, her arm was x-rayed and both her wrist and elbow were found to be broken. She eventually needed two orthopedic surgeries, four months of physical therapy, and had to miss work because of the recovery.

¶ 8    She explained that, months after the injury, Robert told her he had just received his hot dog when the other man "pushed it or like spilled his hot dog." Robert then pushed the man, who bumped into plaintiff.

¶ 9    Andrew Easton testified at deposition that he was with plaintiff, Robert, Abigail and other friends at Wiener Circle on the night of injury. He understood before arriving at the restaurant that Wiener Circle was "a place you have to go in Chicago to experience it. *** [Y]ou're going to have the wait staff yell at you, curse at you, and make fun of you and belittle you, and it's part of the act. It's just how the restaurant works." Easton first noticed the unidentified man after ordering his food. He noticed the man having a "fun" back-and-forth with the wait staff, but that the interaction was getting "louder and more aggressive." He testified that there were four or five wait staff, and one of them yelled at the man and then "pulled out pepper spray, and they were saying that if he didn't calm down, they were going to spray him and then they were going to kick him out." Easton did not know whether the man was intoxicated. Easton agreed that the restaurant design was such that the "employees that are serving food and taking orders are kind of behind, they're in another room, and they're interacting with the customers through windows." He never saw any employee emerge from behind the counter and window to enter the area where the customers wait. He did not believe the interaction between the man and the wait staff was the regular Wiener Circle "schtick," but rather that it was "a little bit too much."

¶ 10    Easton testified that, after the man was told to calm down and warned about the pepper spray, the man pushed Robert, Robert pushed him back, and the man ran into plaintiff. Specifically, he testified:

"[WITNESS EASTON:] [A]t some point [the man] physically pushed [Robert] from behind. And I can't remember if it was from falling into him or if it was actually pushing him, but he was basically up against [Robert] and putting his hands on him.

So [Robert] turned around, and [Robert] pushed him away from him.

***

And then I was standing to the right, sort of in the middle area. So I saw [Robert] push him, and [the man] stumbled and fell across the restaurant and then ran into [plaintiff]."

Easton described Robert's push as a "medium" push, and was surprised that it sent the man stumbling across the restaurant. He was unable to tell whether the man stumbled because he lost his balance after the push or because he was intoxicated.

¶ 11    Easton did not see any employee make physical contact with the man nor with anybody else in the restaurant. He testified the employee did not spray any pepper spray at the man, and agreed he did not know if whether the can was empty or full. He never saw an employee wave a large spoon. Easton did not recall the employees threatening to call the police, but did remember hearing them tell the man to leave. After the fall, nobody in the group knew the extent of plaintiff's injury. The women went outside and sat on a bench with plaintiff while the men brought food out as their orders became ready. Easton testified that no Wiener Circle employees knew the extent of plaintiff's injury before she left the premises.

¶ 12    Robert Lady testified that he had been to Wiener Circle on two occasions prior to the night in question, and he knew to expect employees to "razz people" because of the restaurant's reputation. On October 22, 2011, he and friends had gone to a restaurant and a

number of bars prior to the Wiener Circle, but he did not consider himself intoxicated. When he arrived at the Wiener Circle, the restaurant had approximately 12 to 15 customers inside and a few outside. While he was inside waiting to order food at the counter, he noticed the man, who had been in and out already and "had already made himself known" by "yelling, arguing, ordering, insulting the staff." While he stood at the counter, he testified the man "was continually coming up to the counter and keeping the whole game going with yelling at the staff and - I don't even remember if he was trying to order food. I think he was just there." He further described the situation:

> "[WITNESS LADY:] And I was standing at the counter. The server or cashier that was trying to take our order was yelling at him to go away and to stop and, you know, typical argument. And she reached over towards him with a kind of a wire wooden brush to swat at him.
>
> And he would back off and yell back and forth. Then he left. And he came back again, and he was aggressively reaching over my right shoulder, between [friend] Chad and I, and basically forcing his way up to the counter.
>
> So without really turning around, I, with my right hand, pushed him this way (indicating) - - *** and he just went backwards. And when I heard the commotion, he had stumbled all the way back to the stool over here (indicating), where [plaintiff] was sitting, and she was, I think, already being helped up at that point and being helped outside. And he got up and took off out the door."

¶ 13    He then detailed how he and others went outside with plaintiff, but nobody knew if the injury was serious. He said:

"[WITNESS LADY:]  Everyone else [the group of friends] was still there [on the bench outside the restaurant], checking in on her every now and then, standing around, eating, not really thinking that it was anything serious until she decided that it was."

After approximately one-half hour, he went with her to the hospital.  He did not know if any Wiener Circle employees knew the extent of plaintiff's injuries before she left for the hospital that night.

¶ 14        Lady clarified that he did not actually see the man run into plaintiff.  Rather, Lady was facing the counter and, when the man reached over his shoulder from behind, Lady pushed him away.  He did not turn to look until he heard a commotion behind him, at which point he saw the man leaving the restaurant.  Plaintiff was approximately 15 feet away from Lady at the time.  He also clarified that the man was "[y]elling in a rude manner, not just a funny manner," but that it "was what you'd typically see there[.]"  He specifically described the "wire wooden brush" as a brush to clean a grill.  He did not know whether the employees specifically told the man to leave, or if they were just "swat[ting] him away" from the counter so that other customers could place their orders.  He did not recall any customers telling the man to leave, nor anybody threatening to call the police.  He remembered ordering his food at the counter and getting the "ordering with an attitude" typical of Wiener Circle, but did not think he ever received his food order.  He described the "typical" conduct as "just kind of confrontational, you know, getting attitude back from the staff, yelling and cursing, insulting, that sort of thing," and agreed that most of it is "done in jest, part of the entertainment value. In his opinion, although he could not smell alcohol on the man nor did he see the man

consume any alcohol, from the man's "general mannerisms and appearance," the man who ran into plaintiff was intoxicated.

¶ 15    Erika Howard testified that she has worked off and on as a cook and a food order taker at Wiener Circle for nine years. She could not remember whether she was employed by Wiener Circle in October 2011 and had no recollection of the specific events surrounding plaintiff's injury. She testified that she typically cooks food or takes orders from behind the counter. There is no reason she would be in front of the counter in the main restaurant area because that is not part of her job. She testified that the only employee who might be out in the front of the restaurant is "Johnny" if he is cleaning the restaurant; there is no security or bouncer at Wiener Circle. When asked to describe the late night crowd of customers, she explained:

> "[WITNESS HOWARD:] At 1:00 or 2:00 o'clock in the morning we get drunk people because the bars are closing. So they drunk, singing, dancing. You just get drunk people."

¶ 16    Howard said there were no problems serving the late night customers, and had never seen a drunk customer or any late night customer be unruly. She said:

> "[WITNESS HOWARD:] They drunk. We don't take it personally like they aren't trying to harm us. They drunk. We just see drunk people."

She has never called the police regarding a situation with a customer. She described the interactions between the wait staff and customers as "fun," agreeing that sometimes the customers and wait staff "throw insults back and forth to one another" for fun. She has never seen customers take the joking and insults personally, and said the wait staff does not use curse words during interactions with customers. She denied that the wait staff insults or

shouts at customers and denied there had ever been a situation where a member of the wait staff had to ask a customer to leave because of unruly behavior. She admitted that sometimes the wait staff raises their voices "because we have to get their attention because they drunk." She estimated that 75% of customers between 1 and 2 in the morning are intoxicated.

¶ 17    The record on appeal includes a DVD exhibit showing an episode of the Showtime television show *This American Life*. The episode focuses on the Wiener Circle and includes late night video of the restaurant, packed with seemingly intoxicated customers who are yelling back and forth with the counter staff. Much of the yelling is not good-natured, but, rather, includes racial and sexual insults, as well as vulgarity. The yelling is both from the staff and from the customers. The episode includes an interview with owners Mr. Gold and Mr. Nemerow, who explain that customers come to the Wiener Circle specifically for the back and forth between staff and clientele.

¶ 18    Photographs of the Wiener Circle restaurant in the record on appeal reflect that the restaurant is a small counter service restaurant with picnic tables outside on a sidewalk-area patio and bar stools with a narrow counter lining the walls inside. The ordering and food pick-up area is a high counter with windows. Customers are on one side of the high counter and windows, and employees, cash registers, and food preparation is on the other side of the high counter and windows.

¶ 19    In October 2013, plaintiff filed suit against Wiener Circle, alleging the restaurant was negligent in that it: permitted the continued presence of the quarrelsome man; failed to control the man and remove him from the premises; did not protect against the man's misconduct; encouraged its employees to antagonize, aggravate, and provoke patrons and business invitees; negligently hired people without adequate training to determine when a

patron was too disorderly as to require removal from the premises; failed to warn plaintiff and others of the high incidence and danger associated with customers who become quarrelsome; and failed to provide adequate security to protect plaintiff.

¶ 20    Wiener Circle filed a motion for summary judgment, which the court granted. Plaintiff appeals.

¶ 21                                ANALYSIS

¶ 22                                i. Duty

¶ 23    On appeal, plaintiff contends the trial court erred in granting summary judgment in favor of Wiener Circle. Specifically, plaintiff contends that, where Wiener Circle creates a hostile, volatile environment, it, as a business invitor, has a heightened duty to protect or warn customers of the potential dangers that may arise from such volatility.

¶ 24    Summary judgment is proper when the pleadings, affidavits, depositions and admissions of record, construed strictly against the moving party, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2012). A party opposing a motion for summary judgment "must present a factual basis which would arguably entitle him to a judgment." *Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority*, 172 Ill. 2d 243, 256 (1996). "Although the burden is on the moving party to establish that summary judgment is appropriate, the nonmoving party must present a *bona fide* factual issue and not merely general conclusions of law." *Morissey v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 724 (2010). When determining whether a genuine issue of material fact exists, courts construe the pleadings liberally in favor of the nonmoving party. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). A genuine issue of material fact exists where the facts are in

dispute or where reasonable minds could draw different inferences from the undisputed facts. *Morrissey*, 404 Ill. App. 3d at 724. The purpose of summary judgment is not to try a question of fact, but to determine whether one exists. *Williams*, 228 Ill. 2d at 417; *Golden Rule Insurance Co. v. Schwartz*, 203 Ill. 2d 456, 462 (2003); *Mann v. Producer's Chemical Co.*, 356 Ill. App. 3d 967, 972 (2005) ("Factual disputes cannot be decided as a matter of law [citation]; therefore, where reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact [citation].").

¶ 25    "Summary judgment is to be encouraged in the interest of prompt disposition of lawsuits, but as a drastic measure it should be allowed only when a moving party's right to it is clear and free from doubt." *Pyne v. Witmer*, 129 Ill. 2d 351, 358 (1989). "If the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is proper." *Governmental Interinsurance Exchange v. Judge*, 221 Ill. 2d 195, 215 (2006). We review summary judgment rulings *de novo* (*Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995)) and we will only disturb the decision of the trial court where we find that a genuine issue of material fact exists. *Addison v. Whittenberg*, 124 Ill. 2d 287, 294 (1988).

¶ 26    To properly state a cause of action for negligence, the plaintiff must show that the defendant owed him a duty, that the defendant breached that duty, and that this breach was the proximate cause of his resulting injuries. See *Heastie v. Roberts*, 226 Ill. 2d 515, 555-56 (2007); *Bermudez v. Martinez Trucking*, 343 Ill. App. 3d 25, 29 (2003). Thus, duty is an essential element of a negligence claim; unless the plaintiff can demonstrate that a duty is owed, namely, that he and the defendant stood in such a relationship that the law imposes an

obligation on the defendant to act reasonably for his protection, there can be no negligence imposed upon the defendant. See *American National Bank & Trust Co. of Chicago v. National Advertising Co.*, 149 Ill. 2d 14, 26 (1992); see also *Wood v. Village of Grayslake*, 229 Ill. App. 3d 343, 349 (1992) (court must weigh foreseeability of injury against burden to be placed on the defendant and consequences thereof); *Vega v. Northeast Illinois Regional Commuter R.R. Corp.*, 371 Ill. App. 3d 572, 577 (2007) ("A defendant will not be found negligent unless the plaintiff can demonstrate that a duty was owed."); *Bell v. Hutsell¸* 2011 IL 110724, ¶ 10 ("Unless a duty is owed, there can be no recovery in tort for negligence."); *Ballog v. City of Chicago*, 2012 IL App (1st) 112429, ¶ 21 (In any negligence action, a court must first determine as a matter of law whether the defendant owed a duty to the plaintiff.). " 'Whether a duty of care exists is a question of law, appropriately determined by the trial court on a motion for summary judgment.' " *Vega*, 371 Ill. App. 3d at 577 (quoting *Sandoval v. City of Chicago*, 357 Ill. App. 3d 1023, 1027 (2005)).

¶ 27    In *Marshall v. Burger King Corp.*, 222 Ill. 2d 422 (2006), our supreme court, after recognizing the complex nature of a duty analysis, explained:

> "The touchstone of this court's duty analysis is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff. [Citations.]   This court often discusses the policy considerations that inform this inquiry in terms of four factors: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant. [Citations.]" *Marshall*, 222 Ill. 2d at 436-37.

These four duty factors encompass the "relationship" between the plaintiff and the defendant, and the court must determine whether the plaintiff and the defendant stood in such a relationship that the law imposed upon the defendant an obligation of reasonable conduct for the plaintiff's benefit. *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 18. "The determination of such a 'relationship,' as sufficient to establish a duty of care, requires considerations of policy inherent in the consideration of these four factors and the weight accorded each of these factors in any given analysis depends on the circumstances of the case at hand." *Simpkins,* 2012 IL 110662, ¶ 18.

¶ 28     There are certain special relationships, such as that between a business invitor and invitee, which can give rise to an affirmative duty to aid or protect another against unreasonable risk of physical harm. *Marshall*, 222 Ill. 2d at 438 (citing Restatement (Second) of Torts § 314A (1965)).  The duty of a business invitor to protect against the unreasonable risk of physical harm includes harm caused by a third party's innocent, negligent, intentional, or criminal misconduct. *Marshall¸* 222 Ill. 2d at 439-40 (quoting Restatement (Second) of Torts § 344 (1965)). Section 344 of the Restatement provides, in relevant part:

> "A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons *** and by the failure of the possessor to exercise reasonable care to
>
> > (a) discover that such acts are being done or are likely to be done, or

(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it."  Restatement (Second) of Torts § 344 (1965).

¶ 29        Here, the parties do not dispute that plaintiff was a business invitee of Wiener Circle. Their dispute lies in what duty of care Wiener Circle owed to plaintiff as an invitee. According to plaintiff, because Wiener Circle's late night patrons are "prone to bad and disorderly behavior" of which Wiener Circle is aware, a "reasonable person could conclude that there exists a reasonable likelihood that disorderly conduct endangering patrons is present from time to time at Wiener Circle."  In this argument, plaintiff points to a video documentary, included in the record on appeal, that reflects late night patrons at Wiener Circle and Wiener Circle employees yelling back and forth at one another.  In the video, Wiener Circle principals Larry Gold and Barry Nemerow are interviewed, explaining that Wiener Circle staff regularly scream and swear at the drunk customers, noting that "[t]he employees started having fun [with the schtick], and now people actually come here just for the fun and the - - sometimes there is vulgar language."

¶ 30        Plaintiff contends that, under *Marshall*, Wiener Circle owes her two duties of care:  (1) to protect her from physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons; and (2) to exercise reasonable care to discover that such acts are being done, or to give a warning adequate to enable the visitors to avoid the harm or otherwise protect against it.  She argues that this duty also exists based on "Wiener Circle's own conduct in provoking an intoxicated patron into more and more outrageous behavior while doing nothing to stop his conduct, require him to leave, or otherwise protect other customers from this intoxicated person."

¶ 31    Here, the evidence shows that Wiener Circle's business is centered around a "schtick" in which employees verbally banter with customers.  In the late night hours, however, the schtick appears to become more aggressive.  Employee Howard testified that approximately 75% of Wiener Circle patrons in the late night hours are intoxicated.  The video documentary in the record reflects a high level of tension and vulgarity between the counter staff and the restaurant patrons, originating from both sides of the counter.  According to plaintiff, counter staff waved a large spoon at the man who fell into her.  According to witness Robert Lady, counter staff waved a large metal grill brush at the man.  And according to Easton, he saw one of the wait staff threaten the man with pepper spray.  Specifically, Easton noticed the man having a "fun" back and forth with the wait staff, but that the interaction was getting "louder and more aggressive."  He testified that there were four or five wait staff, and one of them yelled at the man and then "pulled out pepper spray, and they were saying that if he didn't calm down, they were going to spray him and then they were going to kick him out." None of the deponents heard the staff threaten to call the police if the man did not leave. Wiener Circle employee Howard testified there was no security at the restaurant.

¶ 32    We now consider the four duty factors.  Regarding the first factor, foreseeability of injury, we think injury is reasonably foreseeable in a restaurant where 75% of patrons are intoxicated during late night hours and where the gimmick that brings these patrons in is the effort made to engage with customers in a banter which, late at night, apparently drifts into insults and vulgarity, and where restaurant employees, potentially as part of the schtick, brandish wire grill brushes at patrons and threaten patrons with pepper spray.  As to the second factor, the likelihood of injury, we also find it reasonably likely that a patron might get injured in such an environment.  As to the third factor, the magnitude of the burden on

Wiener Circle to guard against or warn of these injuries, the burden is minimal where the restaurant could simply warn against the dangers by posting signage, could properly train its employees not to antagonize customers beyond a certain point, or could hire security to work the late night hours. Regarding the fourth factor, that of the consequences of placing the burden on Wiener Circle, the consequences are minimal where the restaurant could simply hire a security person for a few late night hours or train its staff to recognize when a situation is getting out of hand and when to call the police.

¶ 33        To be clear, we do not hold that all restaurants have a heightened duty to patrons. We disagree with plaintiff's assertion that *Marshall* requires that all business invitors and invitees automatically are in such special relationship one to the other that the invitor must protect the invitee from all unknown and unforeseen dangers. However, where a business invitor such as Wiener Circle here intentionally creates and knowingly maintains a volatile environment in which the likelihood of injury to its invitees is unreasonably high, it has a duty to protect its invitees or to warn them of the dangers.

¶ 34                                   ii.  Proximate Cause

¶ 35        We now turn to the issue of proximate cause. Plaintiff argues that the question of whether Wiener Circle breached its duty and whether that breach was the proximate cause of plaintiff's injuries are factual matters for the jury to decide. She argues that the man who fell into her was intoxicated and threatened by Wiener Circle staff. Believing the threats to be "hollow" and just part of the Wiener Circle schtick, the man left the restaurant. He soon returned, causing the incident which injured her. Wiener Circle employees failed to do anything to make this patron leave, but merely engaged him in angry banter and threats, which only served to exacerbate the problem, culminating in her injury.

¶ 36        Defendant Wiener Circle admits that the question of proximate cause is generally a question for the jury to decide, but, citing *Gyllin v. College Craft Enterprises, Ltd.*, 260 Ill. App. 3d 707, 711 (1994) (Proximate cause "cannot be established by speculation, surmise, or conjecture"), counters that discussion of proximate cause is inappropriate here, as it requires irrelevant speculation. Specifically, Wiener Circle takes issue with plaintiff's argument that: (1) the man who fell into plaintiff had realized the staff's threats were "hollow" and left the restaurant, and then, (2) believing it to all have been part of the Wiener Circle's banter, returned and caused the injury. Wiener Circle argues that there is no evidence to that effect in the record, as the man who fell into plaintiff has never been identified and his thoughts, therefore, cannot be known. Wiener Circle essentially argues it is impossible to know whether the "verbal back and forth between the Wiener's Circle employees and the individual caused him to bump into Robert Lady and proximately caused Robert Lady to push the individual into the Plaintiff without resorting to speculation", because it is not known what the man who fell into plaintiff was thinking, what he did before coming to the restaurant, or what he did during the few minutes he left the restaurant before his return and subsequent injury to plaintiff, any of which "might have caused him to be angry or to come back in and yell at the employees."

¶ 37        "While the issue of the existence of proximate cause is generally a question of fact, at the summary judgment stage the plaintiff must present affirmative evidence that the defendant's negligence was arguably a proximate cause of the plaintiff's injuries." *Hussung v. Patel*, 369 Ill. App. 3d 924, 931 (2007); *Marshall*, 222 Ill. 2d at 430 (While the existence of a duty is a question of law, the issues of whether the defendant breached that duty and whether the breach proximately caused the plaintiff's injury "are factual matters for the jury

to decide, provided there is a genuine issue of material fact regarding those issues."). Proximate cause "cannot be established by speculation, surmise, or conjecture" (*Gyllin v. College Craft Enterprises, Ltd.*, 260 Ill. App. 3d 707, 711 (1994)), but "can only be established when there is a reasonable certainty that defendant's acts caused the injury" (*Kimbrough v. Jewel Cos.*, 92 Ill. App. 3d 813, 817 (1981)).  " 'When the material facts are undisputed and there can be no reasonable difference in judgment as to the inferences drawn from the facts, and there has been no affirmative showing of proximate cause, a plaintiff has failed to establish a genuine issue of material fact.  At this point, proximate cause is a question of law and summary judgment is proper as a matter of law.' " *Hussung*, 369 Ill. App. 3d at 931 (quoting *Gyllin*, 260 Ill. App. 3d at 711).  Proximate cause may be established by circumstantial evidence, which "need not exclude all other possible inferences or support only one logical conclusion [citation], but liability may be established when the facts and circumstances, in the light of ordinary experience, reasonably suggest that the defendant's negligence operated to produce the injury [citation]."  *Mann*, 356 Ill. App. 3d at 974.

¶ 38        Because material facts in this case are disputed, the issue of proximate cause is inappropriate for summary judgment.  See, *e.g.*, *Gyllin*, 260 Ill. App. 3d at 711; *Mann*, 356 Ill. App. 3d at 972 ("Factual disputes cannot be decided as a matter of law [citation]; therefore, where reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact [citation]").  While many things are indeed unknown about the man who fell into plaintiff, the record is clear that the incident occurred in a small, busy restaurant during a time of night in which the majority of patrons are intoxicated.  It is also clear that the Wiener Circle staff makes a practice of, and is in fact

encouraged to, yell at customers. Whether the Wiener Circle staff threatened the man with a grill brush as Robert Lady testified, or with a large spoon as plaintiff testified, or whether the staff brandished a can of pepper spray in a small, enclosed, busy restaurant as Andrew Easton testified, is a disputed fact. Moreover, on the issue of proximate cause, there is room for reasonable difference in judgment as to the inferences to be drawn from even the undisputed facts herein (see, *e.g.*, *Hussung*, 369 Ill. App. 3d at 931) such as, for example, the tertiary nature of the injury in that Wiener Circle staff yelled at or threatened the man, Robert Lady pushed the man, and the man then fell into plaintiff.

¶ 39                                    CONCLUSION

¶ 40        For all of the foregoing reasons, we reverse the decision of the circuit court of Cook County and remand for further proceedings.

¶ 41        Reversed and remanded.