2025 IL App (1st) 242128-U

SECOND DIVISION
August 26, 2025

No. 1-24-2128

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| ELLI CLARK, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 L 1220 |
| | ) | |
| GREG ALBIERO and MARK ZAMPARDO, | ) | Honorable |
| | ) | Daniel J. Kubasiak, |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Van Tine and Justice McBride concurred in the judgment.

ORDER

¶ 1    *Held*:    We affirm the judgment of the circuit court of Cook County granting summary judgment in favor of defendants on plaintiff's complaint for negligence; plaintiff failed to produce evidence that an allegedly defective water heater leaked carbon monoxide into her apartment; although faulty installation of the exhaust system created the potential for carbon monoxide to leak into the apartment, there is no evidence the installation actually allowed exhaust gases into the apartment and caused plaintiff's injuries; and therefore plaintiff failed to raise a genuine issue of material fact as to proximate cause and defendants are entitled to judgment as a matter of law.

¶ 2    Plaintiff, Elli Clark, filed a complaint for negligence against her landlords, defendants Greg Albiero and Mark Zampardo, alleging that due to defendants' negligence, plaintiff was exposed to toxic substances including carbon monoxide in an apartment plaintiff rented from defendants, and that such exposure caused plaintiff multiple injuries. Defendants filed a motion for summary judgment on the ground plaintiff failed to establish proximate cause because there is no competent evidence linking any of plaintiff's alleged injuries to any toxic exposure. The

trial court granted defendants' motion for summary judgment thereby resolving "all issues and disputes before" the court.

¶ 3     For the following reasons, we affirm.

¶ 4                                    BACKGROUND

¶ 5     On June 29, 2023, plaintiff, Elli Clark, filed a first amended complaint for negligence (complaint) against defendants, Greg Albiero (count I) and Mark Zampardo (count II). The complaint alleged that defendants owned a three-unit apartment building in Chicago and that, beginning on June 8, 2014, until September 22, 2017, plaintiff leased and resided in the second-floor unit of defendants' apartment building. The complaint alleged that the second-floor unit (hereinafter "the apartment" or "plaintiff's apartment") had a water heater in a closet in the apartment. "Paragraph 11" of plaintiff's complaint alleged, "The aforementioned water heater did not have a properly installed draft diverter thereby allowing gas exhaust from the water heater to emanate from the water heater throughout the 2nd Floor unit." The complaint alleged that defendants knew or should have known that the water heater did not have a properly installed draft diverter. Plaintiff's complaint alleged that as a direct and proximate result of defendants' negligence with regard to the draft diverter, plaintiff "was exposed to dangerous and harmful exhaust fumes, gas, and other dangerous and harmful compounds, chemicals, and gases" causing plaintiff to sustain injuries.

¶ 6     On July 28, 2023, defendants answered plaintiff's complaint. Particularly, in the July 2023 answer, defendants denied the allegation in paragraph 11 of plaintiff's complaint. In response to plaintiff's previously filed complaint defendants admitted the same allegation.

¶ 7     The parties proceeded with discovery; and on August 9, 2024, defendants filed a motion for summary judgment.

¶ 8 Defendants' motion for summary judgment argued that plaintiff specifically claimed that plaintiff's injuries resulted from an allegedly faulty hot water heater that allowed carbon monoxide to leak into the apartment but that plaintiff "has no competent medical opinion testimony linking any of her alleged injuries to the hot water heater." Instead, defendants argued, plaintiff's entire case "is based upon speculation and conjecture" making summary judgment in favor of defendants appropriate. Defendants' motion also alleged that there is no evidence of elevated carbon monoxide levels in the apartment but defendants failed to make an argument in support of that allegation in the motion for summary judgment. Defendants supported their motion for summary judgment with, *inter alia*, the deposition testimony.

¶ 9 An inspector from the gas company who first reported the allegedly improperly installed draft diverter to plaintiff in 2015, gave a deposition. The gas company inspector inspected the water heater in plaintiff's apartment during a reactivation of service on May 21, 2015, and discovered the issue with the draft diverter on the water heater. The gas company inspector testified that the purpose of a draft diverter is to divert carbon monoxide through the chimney. The gas company inspector was asked, "In working with appliances that utilize natural gas, that burn natural gas, you're familiar with the kind of exhaust those appliances produce?" The gas company inspector responded, "Yes." The gas company inspector agreed that "among those gasses the most common is carbon monoxide" and that carbon monoxide is an odorless and colorless gas. The gas company inspector also testified that a draft diverter takes the exhaust and fumes from a water heater and makes sure that the exhaust does not leak into the residential unit.

¶ 10 A home inspector who, in 2017, inspected the building for purposes of a potential sale, also discovered the alleged issues with the draft diverter. The home inspector testified in a deposition that the "draft hood allows delusion air in to assist in the draft. The combustion air is

going up to the center. Air comes into the draft to allow that ventilation up and through the chimney." The draft hood is one of the components in the vent. The draft hood on the water heater in this case was "taped on, which is incorrect." Further, the "flex vent" that was connected to the draft hood with tape was improper. When asked if the home inspector's "concern about the venting is because of the potential for backdraft," the home inspector responded, "[a]nd [carbon monoxide] entering the living space." The home inspector did not utilize a carbon monoxide meter of any kind in the apartment.

¶ 11  Defendants' motion states that plaintiff identified Dr. Jerold Leikin as a witness pursuant to Illinois Supreme Court Rule 213(f)(2) (independent expert witnesses), among other doctors who provided treatment to plaintiff, and Dr. Matthew Landstrom, Psy.D., as a witness pursuant to Illinois Supreme Court Rule 213(f)(3) (retained expert witnesses), as an expert plaintiff retained to perform a neuropsychological evaluation of plaintiff.

¶ 12  Dr. Leikin testified that plaintiff complained of exposure to a natural gas leak. Dr. Leikin testified as to the results of several tests performed on plaintiff to determine the presence of substances in plaintiff's body but those tests did not include a test for carbon monoxide. Dr. Leikin in his assessment wrote, "It is doubtful there is any toxicology etiology to [plaintiff's] symptom complex." Dr. Leikin reached that conclusion because plaintiff's "symptoms were pretty nebulous" and "if someone has exposure right away to some symptoms, that's not a cumulative toxicity."

¶ 13  When asked, "when you say you doubted toxicology etiology, are you referring to doubting a recent exposure to toxic metals or carbon monoxide that could have caused those symptoms, or are you simply saying, you doubt that [plaintiff has] ever been exposed to any toxin that is causing those symptoms?" Dr. Leiken responded, "I'm not saying ever—*per se*. But

I doubt any recent exposure." Dr. Leikin testified that the tests he performed were not "definitive in saying what went on there" in plaintiff's apartment in terms of determining whether plaintiff had any type of toxic exposure. Dr. Leikin testified that if plaintiff had an exposure to carbon monoxide from 2014 to 2017 plaintiff "could get neuropsychiatric testing and cognitive rehabilitation."

¶ 14    Dr. Landstrom testified that he performed a neuropsychological evaluation of plaintiff on July 26, 2023, and reviewed and took notes on the results of a prior neuropsychological evaluation from 2018. Dr. Landstrom testified that he would not be giving any opinions as to whether any of plaintiff's conditions are causally related to a toxic exposure. Dr. Landstrom would defer to a different specialty with respect to whether any of plaintiff's conditions are causally related to a prior toxic exposure. Dr. Landstrom testified that what he could testify to was "a neurocognitive profile and what deficits are reflected in that and I can speak to correlation, if this exposure, this insult, this injury or whatever, is this profile consistent with the data that you've shown, but in terms of the exact causality" Dr. Landstrom would not give an opinion to a reasonable degree of medical certainty as to whether any of plaintiff's conditions are causally related to a toxic exposure including carbon monoxide exposure.

¶ 15    Dr. Landstrom explained that he can look at an image of the brain for any "deficits" (such as a bleed or tissue damage) and then "hypothesize as to, *** that would be consistent with this thing you're telling me is present." Dr. Landstrom explained that neuropsychologists "don't decide *** it is *because* of this." (Emphasis added.) A neuropsychologist can "can speak to[,] these are the same deficits that you see in that [cause,] but to write it like" an attribution is inappropriate because a neuropsychologist "doesn't have the training and the expertise to weigh in on that ***."

¶ 16    Dr. Landstrom agreed that plaintiff's alleged symptoms are consistent with the most common symptoms of carbon monoxide exposure listed in the *Handbook of Clinical Neurology*. Dr. Landstrom testified, "There's quite a few that overlap directly." Dr. Landstrom also testified that plaintiff's profile is very consistent with how, according to the Handbook, carbon monoxide encephalopathy[1] can present. Specifically, Dr. Landstrom testified those consistencies included deficits in short term memory, confusion, and mood.

¶ 17    Dr. Landstrom was asked the following hypothetical question:

> "[F]rom 2014 to 2017 [plaintiff] was living in an apartment with a water heater that was leaking exhaust into her apartment. It was leaking carbon monoxide exhaust into her apartment and she was inhaling low levels of carbon monoxide over the course of living at this apartment more than a year.
>
> Based on your education, training, and experience, everything you reviewed in this case, including the patient history and medical records, do you have an opinion as to whether her neurocognitive deficits might or could have been caused by prolonged exposure to carbon monoxide?"

¶ 18    Dr. Landstrom responded yes, he did have an opinion, then stated as follows:

> "So essentially if you take a step back, if I had nothing wrong, *** then there's an insult and injury, *** and then we have these deficits, it would certainly be a reasonable attribution to make. So is it a 100 percent known certainty, less so if I don't have prior data to make a direct *** comparison. But what we look at is the consistency, *** how consistent is the neurocognitive profile with what is

---

[1]    "[A] disease of the brain." https://www.merriam-webster.com/dictionary/encephalopathy (visited July 24, 2025).

known from the research. So given how close they are related, it would certainly be a reasonable attribution to make."

Dr. Landstrom also testified that based on plaintiff's own reporting of having these cognitive changes after the alleged exposure, "from a clinical standpoint it would certainly make reasonable sense to proceed following that conclusion." Dr. Landstrom also agreed with counsel's statement that "saying that a presentation is consistent with the data that you collected is different than giving an opinion about causality of that data." Dr. Landstrom reiterated that he would not be giving an opinion that plaintiff's presentation and symptoms are causally related to carbon monoxide exposure.

¶ 19    Defendants' retained expert, Dr. Mark Mycyk, testified to seeing the phraseology "chronic carbon monoxide" mentioned in medical literature and agreed generally with the statement that chronic carbon monoxide poisoning can occur when low levels of carbon monoxide are inhaled over a prolonged period of time. Dr. Mycyk differentiated between a "chronic" exposure to carbon monoxide and an "acute" exposure as a difference in the "duration or time of exposure." An acute exposure is "something that happens over the course of a day, whereas chronic would be for *** days or weeks." Dr. Mycyk testified that flu like symptoms would be uncommon to see in patients with a chronic exposure. Dr. Mycyk agreed that a "chronic low exposure" to carbon monoxide could cause a person to experience nausea, lethargy, or headaches. Dr. Mycyk testified that a chronic low exposure to carbon monoxide was unlikely to result in depression, should not cause weight loss, does "not really" cause forgetfulness, and "doesn't really cause [short-term memory difficulties] at all."

¶ 20    Dr. Mycyk testified that someone who has been diagnosed with carbon monoxide encephalopathy, which "is most commonly diagnosed after somebody has an acute exposure,

\*\*\* typically a big dose, and they are unconscious" could experience alterations in executive function, motor skills (but not vision skills), learning, and memory. Carbon monoxide encephalopathy can cause alterations in mood and social behavior. Dr. Mycyk repeated that people who are diagnosed with carbon monoxide encephalopathy "typically—they arrive in an ER and they were unconscious \*\*\*." Dr. Mycyk testified that it is only possible for someone who has experienced an acute high dose exposure to carbon monoxide to suffer from carbon monoxide encephalopathy.

¶ 21     Dr. Mycyk testified that it was not his opinion that plaintiff never experienced the issues plaintiff complained of, but it was his opinion that "they are not linked to carbon monoxide poisoning." Dr. Mycyk testified that there are potentially many other causes of what plaintiff reported experiencing that are not related to carbon monoxide. Regarding Dr. Mycyk's disclosed opinion that plaintiff's " 'conditions and complaints that she claims to have experienced while living in the apartment at issue and afterwards are not causally related to an alleged carbon monoxide or other environmental exposure,' " Dr. Mycyk explained that by "causally related" Dr. Mycyk means that for some of plaintiff's complaints, "one would have had to have an acute carbon monoxide event" and that was not shown in plaintiff's medical records and other reports. However, Dr. Mycyk agreed that there does not have to be an acute high dose exposure for a person to experience symptoms and conditions related to carbon monoxide exposure. Dr. Mycyk testified that "if one has a chronic low level [dose] one can have some mild symptoms."

¶ 22     Dr. Mycyk testified that a chronic low-level dose "could, potentially, depending on the dose," be a cause of plaintiff's dizziness and nausea, and could, "down the line," be a cause of plaintiff's reduced working memory, divided attention skill issues, poor sustained attention,

reduced word finding abilities, impaired fine motor skills, and executive dysfunction; but not plaintiff's weight loss.

¶ 23     Dr. Mycyk agreed that just because it is too late to document an abnormal carbon monoxide level in a patient does not mean that the patient never experienced an exposure to carbon monoxide; "[b]ut one would have expected *** an abnormal carbon monoxide level measured in the cite [*sic*] of exposure or there's another story about the situation that would make the clinician come to the conclusion that there was carbon monoxide exposure." Dr. Mycyk testified, "They're not related [(plaintiff's complaints and carbon monoxide exposure)] because as far as I could tell there was no carbon monoxide exposure in this case, based on the records provided to me." Dr. Mycyk further testified that it was Dr. Mycyk's opinion that there is no evidence that plaintiff experienced carbon monoxide exposure based, in part, on the fact someone was living with her and they did not experience symptoms. (Plaintiff's companion lived with plaintiff the majority of the time plaintiff lived in the apartment.) Dr. Mycyk explained,

> "Based on the—the records that were provided to me, I didn't see any
> evidence of any carbon monoxide levels detected, any carbon monoxide noted in
> her body, anywhere, anyone else who happened to be sick who was living in the
> apartment during any of that time, so I--as far as I could tell, there was no
> evidence of any carbon monoxide leak or exposure on the premises."

¶ 24     Dr. Mycyk testified that his opinion would not change if there was evidence that the water heater was in fact leaking in the ways plaintiff described and that it had an improper exhaust mechanism. Dr. Mycyk agreed that it is possible that the water heater was leaking carbon monoxide into the apartment and that plaintiff was inhaling low levels of carbon

monoxide for an extended period, but there is no way to test for a biological abnormality or exposure now. According to Dr. Mycyk, "It's all speculative."

¶ 25    Dr. Mycyk testified that carbon monoxide does not accumulate in the body and that if a person is exposed to carbon monoxide the oxygen in their body will eventually displace the carbon monoxide. If a person is removed from the place of exposure the body's production of carboxyhemoglobin will stop; but if the person is returned to the exposure that process will begin again. Dr. Mycyk testified that it is unlikely, but possible, for a person to experience delayed cognitive problems after a chronic low-level exposure to carbon monoxide. Dr. Mycyk testified that neuropsychiatric testing can be performed to determine if someone has delayed cognitive problems due to carbon monoxide. When asked by defendants' attorney, Dr. Mycyk testified that he has not seen any evidence in the records he reviewed that plaintiff suffered carbon monoxide poisoning.

¶ 26    Defendants' motion for summary judgment argued that plaintiff failed to produce evidence that a toxic exposure occurred, nor any "qualified and/or competent expert testimony" to link a toxic exposure to plaintiff's ailments. According to defendants, only Dr. Leikin, a toxicologist, is qualified to offer an opinion on that question; yet, Dr. Lekin could not link a toxic exposure to plaintiff's injuries. Defendants argued that plaintiff presented "only a temporal relationship between her injuries and the alleged cause," but no "factual, conclusive evidence that her injuries were causally linked to the complained of conduct." Defendants argued that plaintiff's case "is entirely lacking [in] any supporting, conclusive evidence that Plaintiff was exposed to carbon monoxide and that exposure caused her injuries."

¶ 27    Plaintiff responded by asserting that a plaintiff can meet their burden of proof as to causation with circumstantial evidence. Plaintiff argued that a hypothetical question is an

acceptable basis for an expert's opinion, and that a physician may testify to what might or could have caused an injury despite the testimony being inconclusive; it is then a question for the trier of fact to determine the facts and inferences to be drawn. Plaintiff argued the direct and circumstantial evidence viewed in the light most favorable to plaintiff demonstrated a *prima facie* case of negligence. Plaintiff recounted the evidence that may suggest that carbon monoxide did leak into the apartment and argued that plaintiff developed health issues while living in the apartment that started to improve as soon as plaintiff moved out of the apartment. Plaintiff's response argued, "Dr. Landstrom testified that [plaintiff's] neurocognitive deficits might or could have been caused by prolonged carbon monoxide exposure when asked a hypothetical question;" and "Dr. Mycyk testified that chronic low-level exposure to carbon monoxide could be a cause of [plaintiff's] numerous symptoms." Plaintiff concluded, "Whether circumstantial or direct evidence, [plaintiff] has demonstrated a *prima facie* case of negligence, including proximate cause."

¶ 28    Defendants' reply to plaintiff's response argued that Dr. Landstrom's testimony on which plaintiff relies is derived from a hypothetical that defendants argue is without basis in actual fact from the record. Defendants also argued that Dr. Mycyk's testimony plaintiff cites in the response is "all *** purely speculative and hypothetical answers;" but in reality, Dr. Mycyk's opinion is "in line with Plaintiff's own treating toxicologist—Plaintiff's ailments cannot be attributed to a toxic exposure, because there are no toxicological findings to support that position nor is there evidence to support an exposure." Defendants argued that a layperson could not reasonably infer causation because the allegations "are technical and complicated." Defendants argued that plaintiff is asking the court to "guess" that plaintiff's ailments are a result of a toxic exposure. Finally, defendants argued that "a temporal proximity between the time the alleged

wrongdoing occurred and the time of the onset of plaintiff's symptoms [is] insufficient to establish defendants proximately caused those injuries."

¶ 29    The trial court found that none of the testimony plaintiff cited in response to defendants' motion establishes a *prima facie* case and that fact, combined with plaintiff's failure to disclose an expert to opine regarding the cause of plaintiff's symptoms, also defeats plaintiff's claims. The court granted summary judgment in favor of defendants.

¶ 30    This appeal followed.

¶ 31                                ANALYSIS

¶ 32    This is an appeal of a judgment granting summary judgment in favor of defendants on a complaint for negligence on the ground plaintiff failed to establish that defendants' negligence was a proximate cause of plaintiff's injuries. "The standard of review is *de novo* for a trial court's grant of a motion for summary judgment. [Citation.] *De novo* consideration means we perform the same analysis that a trial judge would perform." *Jones v. Live Nation Entertainment, Inc.*, 2016 IL App (1st) 152923, ¶ 28. "[B]ecause we review the court's summary judgment ruling *de novo* [citation,] we review only the court's ultimate judgment, not its reasoning in support of that judgment. [Citation.] *** That is to say, the court's precise reasoning in granting summary judgment *** is immaterial for purposes of our review." *Jarosz v. Buona Companies, LLC*, 2022 IL App (1st) 210181, ¶ 29.

¶ 33    "The purpose of the summary judgment procedure is to avoid the needless expense and time of a full trial where there is no showing that the plaintiff has even a *prima facie* case." *Holland v. Arthur Andersen & Co.*, 212 Ill. App. 3d 645, 652-53 (1991).

> "Summary judgment is proper when the pleadings, affidavits, depositions,
> and admissions of record, construed strictly against the moving party, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. [Citations.] [A] plaintiff *** as the nonmoving party, [is required] to present some factual basis and evidentiary facts to support the elements of her cause of action. [Citation.]" *Aalbers v. LaSalle Hotel Properties*, 2022 IL App (1st) 210494, ¶ 15.

¶ 34    "To properly state a cause of action for negligence, a plaintiff must show that the defendant owed her a duty, that the defendant breached that duty, and that this breach was the proximate cause of the plaintiff's resulting injuries." *Aalbers*, 2022 IL App (1st) 210494, ¶ 16. "Proximate cause is an essential element of a negligence claim. [Citation.]" *Berke v. Manilow*, 2016 IL App (1st) 150397, ¶ 32.

"The plaintiff has the burden to ' "affirmatively and positively show" ' that the defendant's alleged negligence caused the injuries for which she seeks recovery. [Citations.] 'Thus, the plaintiff must establish with "reasonable certainty" that the defendant's acts or omissions caused injury.' [Citations.] While proximate cause is generally a question of fact, it becomes a question of law when the facts alleged indicate that a party would never be entitled to recover." *Aalbers*, 2022 IL App (1st) 210494, ¶ 16.

"[A] plaintiff who fails to establish the element of proximate cause has not sustained his or her burden *** and summary judgment is proper." *Berke*, 2016 IL App (1st) 150397, ¶ 32.

¶ 35    "The plaintiff may establish proximate cause via the presentation of circumstantial, rather than direct, evidence." *Aalbers*, 2022 IL App (1st) 210494, ¶ 17.

"It is fundamental that liability in a personal injury action cannot be based on speculation or conjecture ([citation]), and that the burden is on the plaintiff to

produce evidence, either direct or circumstantial ([citation]), to show not only that injuries exist but also that they were the result of the occurrence at issue ([citation]). However, *** it is only where the evidence and all reasonable inferences which could be drawn therefrom, when viewed most favorably for plaintiff so overwhelmingly favors defendant that no reasonable person could find for plaintiff, that the decision as to causation should be taken from the jury, whose function is to weigh contradictory evidence, judge the credibility of the witnesses and make the ultimate conclusion as to the facts ([citations])." *Mesick v. Johnson*, 141 Ill. App. 3d 195, 204-05 (1986).

"All reasonable inferences must be drawn in favor of the nonmoving party ([citation]), but where, 'from the proven facts[,] the nonexistence of the fact to be inferred [is] just as probable as its existence, then the conclusion that it exists is a matter of speculation, surmise, and conjecture, and the trier of fact cannot be allowed to draw it.' [Citation.]

It is therefore incumbent upon us to determine whether the existence of the fact to be inferred *** is 'the only probable, not merely possible, conclusion that can be drawn' from the testimony presented to the trial court. If [not, and a contrary inference] is just as probable ***, 'then the conclusion [asked to be made] is a matter of speculation, surmise, and conjecture, and the trier of fact cannot be allowed to draw it.' [Citation.]" *Mann v. Producer's Chemical Co.*, 356 Ill. App. 3d 967, 974 (2005) (quoting *Wiegman v. Hitch–Inn Post of Libertyville, Inc.*, 308 Ill. App. 3d 789, 795-96 (1999)).

"[T]he conclusion must be one that can reasonably be drawn, and the mere possibility of a causal connection is simply insufficient to raise the requisite inference of fact. [Citations.]" *Aalbers*, 2022 IL App (1st) 210494, ¶ 17.

¶ 36    Upon that legal backdrop, plaintiff argues the trial court erred in failing to consider all of the evidence when it found that plaintiff failed to provide any evidence in support of plaintiff's claims. Specifically, plaintiff argues the trial court failed to consider evidence of defendants' negligence, the trial court failed to consider evidence of proximate cause, the trial court erred by determining the weight and credibility of the evidence to decide a question of fact, and the trial court erred by construing the evidence in favor of defendants—specifically by inferring that certain clinical findings were attributable to plaintiff's prior employment.

¶ 37    As stated above, "the court's precise reasoning in granting summary judgment *** is immaterial for purposes of our review." *Jarosz*, 2022 IL App (1st) 210181, ¶ 29. We will construe plaintiff's argument to ask this court to consider the alleged evidence of defendant's negligence and proximate cause in a light most favorable to plaintiff, which we will. *Live Nation Entertainment, Inc.*, 2016 IL App (1st) 152923, ¶ 28 ("pleadings, depositions, admissions, and affidavits on file, [must be] viewed in the light most favorable to the nonmoving party"). Further, we are cognizant of the fact that a court cannot make credibility determinations or weigh evidence in deciding a summary-judgment motion. *Fox v. Food & Drink Chicago, Inc.*, 2024 IL App (1st) 230755, ¶ 53 (quoting *Coole v. Central Area Recycling*, 384 Ill. App. 3d 390, 396 (2008)).

¶ 38    With that in mind, plaintiff first argues that based on the direct and circumstantial evidence viewed in a light most favorable to plaintiff it is reasonable to infer that carbon monoxide exhaust was leaking into the apartment "because the improper venting restricted and

prevented proper drafting out of the building" and "the water heater's vent was not properly secured to the chimney." Plaintiff also argues that defendants' "admission" in its answer to plaintiff's prior complaint that the "water heater did not have a properly installed draft diverter, thereby allowing exhaust gases from the water heater to emanate from the water heater throughout the 2nd floor unit" should be considered as a non-binding evidential admission. *Bartsch v. Gordon N. Plumb, Inc.*, 138 Ill. App. 3d 188, 197 (1985) ("admissions in pleadings in other actions, or those which have been amended, abandoned, or withdrawn, also constitute non-binding evidential admissions").

¶ 39    Plaintiff asserts that defendants admitted the allegation in the prior complaint based on testimony by the gas company inspector that the water heater produced carbon monoxide. On appeal, plaintiff cites only the gas company inspector's statement that carbon monoxide is the most common exhaust from natural gas appliances. We find that the gas company inspector's testimony does not provide direct or circumstantial evidence that the water heater at issue caused carbon monoxide to leak into plaintiff's apartment. *Yamada v. Hilton Hotel Corp.*, 60 Ill. App. 3d 101, 107 (1977) ("when there is a complete absence of probative facts supporting an inference *** such inference is clearly unreasonable"). To find that this testimony proves that the water heater at issue caused carbon monoxide to leak into plaintiff's apartment would be a matter of speculation, surmise, or conjecture. *Berke*, 2016 IL App (1st) 150397, ¶ 34 (liability may not be predicated on speculation, surmise, or conjecture). The only evidence upon which an inference could be based is the gas company inspector's testimony that carbon monoxide is the most common exhaust from gas appliances like the water heater and the home inspector's concern about the "potential" of "[carbon monoxide] entering the living space." Neither inspector testified that the water heater at issue was leaking carbon monoxide into the apartment. That this

water heater was leaking carbon monoxide into the apartment is only a "possible" conclusion that may be drawn; and plaintiff has cited no evidence it is the probable conclusion that may be drawn from the evidence. *Aalbers*, 2022 IL App (1st) 210494, ¶ 17.

¶ 40    As for defendants' alleged admission in answering plaintiff's prior complaint, we find, accepting defendants' answer to the prior complaint as an evidentiary admission, the admission is not sufficient to defeat summary judgment. Evidentiary admissions like the one at issue may be controverted by a party. *National Union Fire Insurance Co. of Pittsburgh v. DiMucci*, 2015 IL App (1st) 122725, ¶ 56. Defendants argue the admission does not offer evidentiary proof that there was an exposure to carbon monoxide as a result of defendants' negligence and does not present an affirmative, evidentiary showing of proximate cause. We agree that the admission is not proof plaintiff was exposed to carbon monoxide. The specific allegation that plaintiff claims defendants admitted was that the water heater "allow[ed] exhaust gases from the water heater to emanate from the water heater." Neither that allegation nor paragraph 11 of the instant complaint alleges that the water heater exhausted carbon monoxide into the apartment. On appeal, plaintiff confines the argument to carbon monoxide as the alleged cause of plaintiff's injuries. Plaintiff has forfeited any argument that another gas caused the injuries at issue. IL S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Regardless, on appeal defendants assert that the record does not contain evidence of an exposure to carbon monoxide or any toxic gas. Once defendant satisfies their initial burden to establish an absence of evidence to support an element of the plaintiff's case the burden shifts to plaintiff to present a factual basis that would arguably entitle them to a favorable judgment. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). Plaintiff failed to adduce direct or circumstantial evidence of any toxic exposure.

¶ 41    Furthermore, defendants primarily rely on their argument that plaintiff failed to establish proximate cause. We agree this case may be resolved on the question of whether plaintiff has established that defendants' alleged negligence was a proximate cause of plaintiff's alleged injuries.

¶ 42    Plaintiff argues that, based on the evidence on file, it is reasonable to infer that plaintiff's "health issues and cognitive and executive deficits that developed while living in the apartment were caused by carbon monoxide exposure." In support of that contention on appeal, plaintiff relies on specific alleged evidence of causation: that some of plaintiff's conditions began to improve after she moved out of the apartment; that "Dr. Mycyk testified that chronic low-level exposure to carbon monoxide could be a cause of [plaintiff's] numerous symptoms;" and that "Dr. Landstrom testified that [plaintiff's] neurocognitive deficits might or could have been caused by prolonged carbon monoxide exposure."

¶ 43    We find that the evidence on which plaintiff relies does not "affirmatively and positively show" that defendants' alleged negligence caused plaintiff's alleged injuries. The evidence is "insufficient to raise the requisite inference" that plaintiff's alleged injuries were caused by a chronic low-level exposure to carbon monoxide. *Aalbers*, 2022 IL App (1st) 210494, ¶ 17. That inference is a "merely possible[] conclusion that may be drawn" (*Berke*, 2016 IL App (1st) 150397, ¶ 35) but it is not the probable conclusion to be drawn from the facts on which plaintiff relies (*Mann*, 356 Ill. App. 3d at 974). The evidence on which plaintiff relies demonstrates nothing more than "the mere possibility of a causal connection" between the water heater and plaintiff's injuries and is insufficient to "raise the requisite inference of fact" to establish proximate cause. *Haslett v. United Skates of America, Inc.*, 2019 IL App (1st) 181337, ¶ 44.

¶ 44    Plaintiff cites *Hahn v. Union Pacific R. Co.*, 352 Ill. App. 3d 922, 930 (2004), for the proposition that a medical expert's opinion of what "might or could" have caused an injury is sufficient to " 'affirmatively and positively show[,]' with 'reasonable certainty' " (*Berke*, 2016 IL App. (1st) 150397, ¶ 37), causation. Reliance on *Hahn* is misplaced because *Hahn* was an action under the Federal Employers' Liability Act (FELA). *Id.* at 929. The *Hahn* court acknowledged that

> "the plaintiff's burden in a FELA action is much less stringent than it would be in
> an ordinary negligence action. To avoid a summary judgment, Hahn was required
> to elicit evidence that Union Pacific's negligence played just the slightest part in
> producing his injury. [Citations.] In meeting this burden, Hahn is not required to
> put on evidence regarding the occurrence of a specific accident. Rather, under
> FELA, a condition that developed over the course of several years can be an
> 'injury'. [Citation.]" *Hahn*, 352 Ill. App. 3d at 930.

¶ 45    The *Hahn* court held that the plaintiff's medical expert's testimony "meets the 'might or could' standard for medical opinion testimony and is more than sufficient to survive a motion for a summary judgment in a FELA action." *Hahn*, 352 Ill. App. 3d at 931. The holding in *Hahn* is not applicable in this case because the *Hahn* court decided the issue of whether the evidence of causation was sufficient to survive the defendant's motion for summary judgment under the less stringent standard for FELA cases. *Id.* at 930, 931. The decision in *Hahn* does not provide this court with a standard by which to judge whether plaintiff's evidence in this standard negligence action is sufficient "to 'affirmatively and positively show' that [defendants'] alleged negligence caused the injuries for which the plaintiff seeks recovery." *Bermudez v. Martinez Trucking*, 343 Ill. App. 3d 25, 29 (2003).

¶ 46 Furthermore, to the extent *Hahn* could be read to discuss a "might or could" standard for medical testimony in a standard negligence case, plaintiff misapplies that "test" in this case. The *Hahn* court found that the medical opinion testimony in that case met the "might or could" standard set forth in *Mesick* and *Geers*. *Hahn*, 352 Ill. App. 3d at 930. *Geers* was an appeal after a judgment in a jury trial in favor of the plaintiff in an automobile collision case. *Geers v. Brichta*, 248 Ill. App. 3d 398, 399-400 (1993). The *Geers* court rejected the defendant's argument that the trial court "improperly admitted the deposition testimony of [the plaintiff's treating physicians] because both testified that it was only 'possible' that [the] plaintiff's medical condition was caused by the *** collision." *Geers*, 248 Ill. App. 3d at 407. The *Geers* court, also relying on *Mesick*, held that "[a] physician may testify to what might or could have caused an injury despite any objection that the testimony is inconclusive." *Geers*, 248 Ill. App. 3d at 407 (citing *Mesick v. Johnson,* 141 Ill. App. 3d 195, 205 (1986)). The only issue the *Geers* court addressed was whether the physicians' testimony was based on conjecture or speculation. *Geers*, 248 Ill. App. 3d at 407-08. The *Geers* court found that it was not. *Id.* The court found that the physicians "testified that from their examinations of [the] plaintiff, and the medical history [the] plaintiff related to each of them, they were of the opinion, based on a reasonable degree of medical certainty, that it was possible that [the] plaintiff's injuries were related to the *** collision." *Geers*, 248 Ill. App. 3d at 408. Therefore, the court found that "[t]he testimony of these doctors [met] the 'might or could' standard set forth in *Mesick,* and *** was properly admitted." *Geers*, 248 Ill. App. 3d at 408.

¶ 47 In *Mesick*, the plaintiff presented the testimony of two physicians, one by deposition and one by testimonial offer of proof. *Mesick*, 141 Ill. App. 3d at 202-03. One doctor testified that the injury "was 'consistent' with the trauma [the] plaintiff related having sustained in the collision."

*Mesick*, 141 Ill. App. 3d at 202. The second doctor testified that the injury "could have" been caused by the accident. *Mesick*, 141 Ill. App. 3d at 203-04. The trial court found that the testimony was not sufficient to establish a causal relationship between the collision and [the] injuries." *Mesick*, 141 Ill. App. 3d at 204. On appeal, the *Mesick* court found that,

> "it is also well-settled that a physician may testify to what might or could have caused an injury despite any objection that the testimony is inconclusive. 'Such testimony is but the opinion of the witness given on facts assumed to be true.' [Citation.] It remains for the trier of fact to determine the facts and the inferences to be drawn therefrom." *Mesick*, 141 Ill. App. 3d at 205-06.

¶ 48      The *Mesick* court held that the physicians' testimony that the accident "might or could have been the cause of [the] injuries" was proper and admissible because it was based on their examination of the plaintiff, the plaintiff's medical history, and given "based on a reasonable degree of medical certainty." *Mesick*, 141 Ill. App. 3d at 206. The *Mesick* court rejected the defendant's arguments that the physicians either "negated" or "retreated" from their opinions, finding that, "the fact that there may be inconsistencies does not render the testimony inadmissible, but goes only to the weight to be accorded it—a matter within the province of the jury. [Citation.]" *Mesick*, 141 Ill. App. 3d at 207.

¶ 49      We find that nothing in the decisions in *Hahn*, *Geers*, nor *Mesick* leads this court to conclude that a physician's testimony that a defendant's negligence "might or could" have caused the plaintiff's injury, or that a plaintiff's injuries are "consistent" with an injury that "could" result from a defendant's alleged negligence, is sufficient to "affirmatively and positively show" with "reasonable certainty" that the defendant's negligence was, at minimum, a material factor in brining about the injury. In *Geers* and *Mesick*, on which the *Hahn* court relied,

the plaintiff had raised a question for the jury on the issue of causation without the challenged testimony. *Geers*, 248 Ill. App. 3d at 406-07, *Mesick*, 141 Ill. App. 3d at 205. In *Geers* and *Mesick*, the fact that the plaintiffs' treating physicians' testimony was inconclusive went only to the weight of the testimony, not its admissibility. *Geers*, 248 Ill. App. 3d at 407-08, *Mesick*, 141 Ill. App. 3d at 207. The sufficiency of that testimony to establish a *prima facie* case of negligence was not an issue in those cases. *Id.*, see *Hahn*, 352 Ill. App. 3d at 932 (although decided at the summary judgment stage, the court noted that, "The medical testimony narrows the range of probabilities with regard to medical causation for the jury."). We find that a "might or could" standard applicable to expert testimony only describes testimony that is admissible for a trier of fact to weigh as to causation but is not a standard for the sufficiency of the evidence to establish proximate cause to withstand a motion for summary judgment. This finding is consistent with "the rule that proximate cause is not established where a causal connection is contingent, speculative, or merely possible. [Citations.]" *Wilcox v. Advocate Condell Medical Center*, 2024 IL App (1st) 230355, ¶ 102.

¶ 50   As for establishing proximate cause in this case, we find that plaintiff's bare assertion, without citation to legal authority, that it is a reasonable inference that plaintiff's injuries were caused by carbon monoxide exposure, is insufficient to satisfy plaintiff's burden on appeal. *Wolfe v. Menard, Inc.*, 364 Ill. App. 3d 338, 348 (2006) ("The appellant must argue the points that he or she raises, or they are waived. [Citation.] A conclusory assertion, without supporting analysis, is not enough. [Citation.]"). Regardless, the "facts" on which plaintiff relies, viewed in a light most favorable to plaintiff, do not affirmatively and positively show that any of plaintiff's alleged injuries were caused by carbon monoxide. "[C]ircumstantial evidence alone may be enough to defeat summary judgment if the conclusions to be drawn from the evidence are

probable, not merely possible." (Internal quotation marks omitted.) *Heider v. DJG Pizza, Inc.*, 2019 IL App (1st) 181173, ¶ 38, *Berke*, 2016 IL App (1st) 150397, ¶ 35.

¶ 51    Plaintiff's claim that Dr. Landstrom testified that plaintiff's neurocognitive deficits might or could have been caused by prolonged exposure to carbon monoxide is misleading. Dr. Landstrom actually testified that it would be a "reasonable attribution" to attribute plaintiff's symptoms to carbon monoxide exposure because of the level of "consistency" between the alleged injury (carbon monoxide exposure) and the alleged "deficits." In other words, Dr. Landstrom testified that someone else *could* say that plaintiff's injuries "might or could" be caused by carbon monoxide exposure. Dr. Landstrom testified that some of plaintiff's symptoms (deficits in short-term memory, confusion, and mood) were consistent with carbon monoxide encephalopathy; but no witness testified that plaintiff ever suffered from carbon monoxide encephalopathy and Dr. Mycek testified plaintiff could not have suffered from carbon monoxide encephalopathy because carbon monoxide encephalopathy requires an acute exposure. Further, Dr. Landstrom made it clear that he would not be giving any opinions as to whether any of plaintiff's conditions are causally related to a toxic exposure.

¶ 52    We find that Dr. Landstrom only testified that it is possible (or reasonable) to find causation in this case but not that causation is probable. We find that Dr. Landstrom's testimony cannot affirmatively and positively show that defendants' alleged negligence caused plaintiff's alleged injuries. See *Mann*, 356 Ill. App. 3d at 974 (the fact to be inferred must be the only probable, not merely possible, conclusion that can be drawn otherwise the conclusion is a matter of speculation, surmise, and conjecture), *United Skates of America, Inc.*, 2019 IL App (1st) 181337, ¶ 41 ("[l]iability cannot be based on guess, speculation, or conjecture as to the cause of the injury.").

¶ 53    Plaintiff also claims that Dr. Mycyk testified that chronic low-level exposure to carbon monoxide could be a cause of plaintiff's symptoms. Even viewing Dr. Mycyk's testimony in a light most favorable to plaintiff that assertion is a mischaracterization. Dr. Mycyk qualified his testimony that a chronic low-level dose of carbon monoxide could cause dizziness and nausea by stating that those symptoms only had the potential to occur and, regardless, it would depend on the dose of carbon monoxide received. Dr. Mycyk testified chronic low-level exposure could cause dizziness and nausea, "If it's ongoing, it could, potentially, depending on the dose." Dr. Mycyk also testified that, "in order to be symptomatic from carbon monoxide, the degree of symptoms do depend on the dose for sure and the duration of exposure for sure." With regard to reduced working memory, divided attention skills, and poor sustained attention, Dr. Mycyk consistently qualified his testimony that chronic low-level exposure could cause those symptoms depending on the dose, duration, and context of the exposure. We note plaintiff has pointed to nothing in the record to establish that plaintiff was in fact exposed to carbon monoxide and no evidence of what dose plaintiff might have received. Nonetheless, assuming, *arguendo*, plaintiff was subjected to a chronic low-level dose of carbon monoxide while residing in the apartment, we find that any testimony Dr. Mycyk provided about a causal connection between plaintiff's alleged exposure to carbon monoxide and plaintiff's alleged injuries was that a causal connection was, at best, "contingent, speculative, and merely possible" and, therefore, proximate cause is not established. *Wilcox*, 2024 IL App (1st) 230355, ¶ 102.

¶ 54    We find persuasive defendants' reliance on the decision in *Hussung v. Patel*, 369 Ill. App. 3d 924 (2007). In *Hussung*, the plaintiff argued that the timing between the alleged negligence and the plaintiff's injury "is so remarkable, so contemporaneous, that its causal relationship is evident and cannot be doubted." The plaintiff argued that the circumstances

justified an inference of proximate cause. *Hussung*, 369 Ill. App. 3d at 931-32. The *Hussung* court agreed with the defendants that "that the temporal relationship between the alleged negligence and plaintiff's injury is insufficient to raise a genuine issue of fact as to the existence of proximate cause." *Hussung*, 369 Ill. App. 3d at 932. The court found that "none of [the] plaintiff's experts can point to any affirmative evidence linking the [defendants' conduct] to plaintiff's injuries." *Hussung*, 369 Ill. App. 3d at 932. The *Hussung* court noted that Illinois courts had rejected "a *post hoc ergo propter hoc* argument" and that several "other jurisdictions have held that a ' "temporal association alone does not suffice to show a causal link" because a mere temporal coincidence between two events does not necessarily entail a substantial causal relation between them.' " *Hussung*, 369 Ill. App. 3d at 933. Therefore, summary judgement was properly granted. *Id.* at 932.

¶ 55    Defendants argue that the *Hussung* court's analysis is applicable in this case. We agree. Although plaintiff does not expressly rely on the contemporaneity of plaintiff's residence in the apartment and plaintiff's alleged injuries as establishing proximate cause, we find that is all the evidence proves, and that is insufficient to raise a genuine issue of fact as to proximate cause. *Hussung*, 369 Ill. App. 3d at 934 ("if we were to conclude that contemporaneity could prove causation, we would inappropriately shift the burden of proof from the plaintiff to the defendant."). That plaintiff may have felt better after she moved does not explain what caused her to feel bad in the first place and does not create a genuine issue of material fact as to causation. See *Berke*, 2016 IL App (1st) 150397, ¶ 39 (citing *Strutz v. Vicere*, 389 Ill. App. 3d 676, 681 (2009)). Plaintiff has failed to affirmatively and positively show with reasonable certainty that chronic low-level exposure to carbon monoxide caused plaintiff's injuries (or even that it occurred).

¶ 56    We note that we are not relying on Dr. Mycyk's testimony or that of any other witness that testified that plaintiff's alleged injuries are not causally related to carbon monoxide exposure, nor on plaintiff's prior employment, to find a question of fact in favor of defendants. In other words, we are not, as plaintiff complained of the trial court, weighing competing evidence to decide a question of fact nor are we construing the evidence in favor of defendants.

¶ 57    Finally, we note that plaintiff argues in reply that Dr. Leiken testified "that it is possible" plaintiff experienced cumulative carbon monoxide exposure; but plaintiff does not develop that statement into an argument in support of finding proximate cause. Nonetheless, that testimony is not conclusive and expresses only a possibility of carbon monoxide exposure and says nothing about causation. Therefore, Dr. Leiken's testimony is also insufficient to establish proximate cause.

¶ 58    The mere possibility that the defendants' negligence could have caused plaintiff's alleged injuries fails to provide the necessary causal relationship between defendants' alleged negligence and plaintiff's injuries to establish proximate cause. *Berke*, 2016 IL App (1st) 150397, ¶ 42. And, as demonstrated above, Dr. Landstrom's response to plaintiff's hypothetical and Dr. Mycyk's testimony leave the matter open to speculation and surmise. We find that plaintiff has failed to establish proximate cause by direct or circumstantial evidence of a causal connection between a toxic exposure to carbon monoxide and plaintiff's alleged injuries; and, therefore, plaintiff has failed to make a *prima facie* case of negligence. *Berke*, 2016 IL App (1st) 150397, ¶ 32 ("a plaintiff who fails to establish the element of proximate cause has not sustained his or her burden of making a *prima facie* case and summary judgment is proper"). Therefore, defendants are entitled to judgment as a matter of law.

¶ 59                                         CONCLUSION

¶ 60    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 61    Affirmed.